# Richmond.

STONER AND ALS v. HARRIS AND ALS.

FEBRUARY 18th, 1886.

1. EQUITABLE ESTATES—*Sub-vendees—Notice.*—Purchaser or incumbrancer of mere equitable title must take the place of the person from whom he purchases; and vendor may resort to the estate, whether purchaser of mere equitable estate from his vendee, purchased with notice, or without notice.

2. VENDOR'S LIEN—*Assignees—Priorities—Prior tempore, potior jure— Case at bar.*—By parol in 1853, P. purchased a house and lot of M., giving him bonds for the deferred payments, one whereof was assigned to H. Then the legal title was not in M., but he later obtained it. In suit to administer estate of P., who died in 1855, the bond assigned to H. was reported among the debts. In that suit the property was sold to M. P.'s debts were paid, but only part of the bond assigned to H. was paid. M. got no deed from the court, not having entirely paid for the property, but in 1861, by parol, he sold it to B., who gave for the deferred payment a bond, which was assigned to S. In 1865 suit was brought by S. to sell the property to pay the bond of B. assigned to S. In this suit the bond assigned to H. was reported as the first lien. S. excepted to the report.

HELD :

    1. B. had ample means of notice of the lien of H., as assignee of the bond of P., the first vendee of M., on the property in B.'s hands.

    2. After satisfying the lien of H. on the property in his hands, B. would be entitled to set off the amount thereof against his bond for the deferred payment, whether in the hands of M. or of his assignee, S.

    3. H.'s lien on the property hath priority over the lien of S. on the same.

Appeal from decree of circuit court of Augusta county, entered June 18, 1883, in the causes (then heard together) of *Stoner* v. *Beck's Adm'r, &c.,* of *Stoner* v. *Beck's Adm'r, &c.,* and of *Beck's Widow and als.* v. *Beck's Infants.* The decree being detrimental to Daniel Stoner and Robert S. Harnsberger, they obtained an appeal to this court.

Opinion states the case.

*T. C. Elder* and *Sheffey & Bumgardner,* for the appellants.

*J. T. Harris, Jr.,* and *W. J. Robertson,* for the appellees.

LACY, J., delivered the opinion of the court.

In 1853, M. G. Harman sold a house and lot in the city of Staunton to Daniel A. Pitman, received part of the purchase money in cash, and took two bonds of the said Pitman for $913.33 each, due at one and two years. Harman assigned these bonds to Irick, and the bond falling due August 15, 1855, passed by assignment into the hands of Harris.

In the spring of 1855 Pitman died, and in June of that year Simon Bonavita, M. G. Harman, and N. K. Trout, adm'r of said Pitman, dec'd, and others, filed their bill in the circuit court of Augusta for the settlement of the Pitman estate, and to subject the said house and lot to the payment of the debt due on it under the purchase from Harman. The sale by Harman to Pitman had been by parol, and Harman did not have the deed to the property, which he had bought from Sterritt & White, at the time of the sale to Pitman, but he obtained the deed in November of that year from his vendors, and caused the same to be recorded.

In the said cause of *Bonavita* v. *Pitman, &c.,* an account and report was made by one of the commissioners of the court,

ascertaining the debts and reporting the liens on the said real estate of Pitman. Among these liens was reported the said bond acquired by Harris of $913.33, due August 15th, 1855. A sale of the real estate was decreed, and N. K. Trout appointed a special commissioner to make the sale, which was made July 30th, 1857. M. G. Harman became the purchaser at the sum of $2,120. This sale was confirmed at the November term, 1857, and Commissioner Trout authorized to withdraw the bonds of Harman the purchaser, collect the same and apply the proceeds to the payment of the debts of Pitman in the above mentioned report of the master commissioner; all of which debts were discharged except the debt due Harris, upon which certain payments were made; but the whole debt due Harris was not paid, and has not yet been paid. Harman attempted to discharge this debt, through the Special Commissioner Trout in 1863, by the payment of Confederate money, which Harris refused to receive. And the deed to Harman, as the purchaser of this lot, has never been made by Special Commissioner Trout, because Harman never finished paying for the land. Harman, however, being in possession of this house and lot under his purchase, on the 28th of November, 1861, sold the same to John Beck by parol agreement, received $600 in cash, and Beck executed his bond to Harman for "$3,400, balance on house and lot lately owned by Shry." This bond Harman assigned, on February 15th, 1862, to R. S. Harnsberger, who, on the 21st day of November, 1864, assigned it to Daniel Stoner.

In 1865 Daniel Stoner, through N. K. Trout, his counsel, brought this suit to subject the real estate aforesaid to the payment of the bond of Beck, which had been assigned to him as stated. In this suit (which has been, by decree therein of April 3, 1883, directed to be heard together with the suit of *Beck's Widow* v. *Beck's Infants and others*), a commissioner's

report of the liens on the said lot was made, in pursuance of decree rendered in the cause.

In this report of the master commissioner reporting the liens on this property, the debt due John T. Harris was reported as secured by the first lien on the property prior and to be preferred to the lien of Daniel Stoner. Daniel Stoner claimed to be entitled to the first lien on the said lot, and excepted to the commissioner's report, reporting the Harris debt as having preference. But the circuit court overruled his exception, and confirmed the commissioner's report, whereupon he appealed.

The sole question here in controversy is the question thus raised as to the priority of the lien of John T. Harris and its preference over the lien of Daniel Stoner.

The appellants insist that Stoner was a purchaser for value of the Beck bond, and a purchaser of the same without notice of the claim of John T. Harris. That the equity of Stoner is not merely equal to that of Harris—it is superior to it. For whilst the security provided by Harman for the Beck bond was the same in kind with that provided by him for the Pitman bond—namely: the retention of the title to the property for which these bonds were given—yet, when the sale to Beck was made, Harman, as then appeared of record, was the owner of the legal title. Stoner, in purchasing Beck's bond, could not have presumed that Harman had made any *parol* sale of the property, or retained any secret lien thereon before he had acquired legal title thereto. Harman was really in no condition to sell the property, or to create a lien thereon prior to the second day of November, 1855, when the same was conveyed to him. That Stoner, when he purchased the Beck bond, virtually paid to Harman, for Beck, all his purchase money. That it is true that Beck's estate is entitled to protection, at least to the extent of his unpaid purchase money, the Beck estate cannot be made to pay Stoner and Harris

both; but that this is not the question; that Beck's estate has no equity for the enforcement of Pitman's bond held by Harris.

The appellants rely upon the case of *Moore* v. *Holcombe*, 3 Leigh, 597, citing Judge Tucker as saying in that case: "It is true that assignees take every bond subject to the obligor's equity against the obligee; but I have yet to learn that they take subject to an unknown equity of a stranger against the obligee. The equity set up by an obligor is against the bond— it is to avoid the bond. But the equity of Hancock is not to discharge or vacate, but to enforce the bond for his benefit. Can it be possible that the assignees take subject to this equity?"

It is true that the case of *Moore* v. *Holcombe* was considered and decided upon a consideration of the implied vendor's lien, maintained by courts of equity in favor of the vendor who had parted with the legal title, but had not been paid the purchase money. The vendee sold and conveyed the property, and assigned the bonds of the sub-vendee for value before the sub-vendee had any notice of the claim of the original vendor for the unpaid purchase money due to him. The sub-vendee refused to pay the assigned bonds, and submitted himself to the determination of the courts as to which claim he should pay, whether the assignees of his obligee or the claim against his vendor, the said obligee of the original vendor.

The court held that there was no way by which the sub-vendee could be made to pay the purchase money twice, as he had been guilty of no wrong. And upon a comparison of equities between the equitable implied lien of the first vendor, and the claim of the assignees who had purchased the bonds without notice of the arrears due on the land, this court decided that the assignees had the best right—one of the judges saying (in that case all the judges wrote opinions, and

all concurred): "When the vendee of land still retains the estate, it is clearly liable for the whole of the unpaid purchase money by virtue of the vendor's lien. When he has sold to a sub-vendee, and the title has been made by him, and the money paid before notice of the original vendor's lien, the sub-vendee holds discharged of that lien. Where, however, a part of the purchase money is unpaid by the sub-vendee, the land in his hands is liable for that unpaid portion, but for no more. The equity is that he shall pay to the original vendor whatever he himself yet owes to his own vendor. If he owes anything, he and his land are discharged upon his paying of that to the original vendor's demand; and if he owes nothing, neither himself nor his land are in anywise responsible. That the vendor's lien is lost as to the land by a sale to a subsequent vendee without notice, is clear. And if he has any lien upon the bonds given by the sub-vendee, why should not that lien also be lost by a sale of the bonds without notice? I can see no distinction." See opinion of Judge Tucker in *Moore v. Holcombe, supra,* and cases cited.

See the opinion of Chancellor Kent in *Murray* v. *Lylburn,* 2 Johns. Ch. R. 442, and the case of *Livingston* v. *Dean,* Id. 479, 480. That case turned upon the question of notice, which was admitted; but the decision in *Murray* v. *Lylburn* was expressly cited and approved.

That the equity which was originally attached to a bond will follow it into the hands of an assignee with or without notice, is clear and well settled. *Turton* v. *Benson,* 1st P. Williams, 479; *Hill* v. *Caillovel,* 1 Vesey, 123; *Murray* v. *Lylburn, supra,* 4 Vesey, Jr. 121.

In the elaborately argued case of *Norton* v. *Rose,* 2 Wash. 233, 254, it was strenuously argued that if the assignee of a bond must take it subject to any concealed equity which may be attached to it, the negotiability of such papers would be

at an end. But the court held, all the judges writing opinions, and all concurring, that the assignee takes it subject to all the equities of the obligor; that he may always go to the obligee before purchasing and ascertain for himself what he is buying when he thus proposes to buy a suit or to intermeddle in the feud of another. And so the decisions stand in this court to the present time. This is admitted, and was examined critically in the cases of *Moore* v. *Holcombe* and *Gordon* v. *Rixey ;* cases cited on opposite sides in this controversy. And while the appellants admit that Stoner in this case is affected with any equity of Beck against Harman, his vendor, and the obligee on his bond, they deny that Stoner is affected with any equity of Harris, of which they had no notice, Harris being a third person, a stranger, and the alleged holder of an equity, against which they were not afforded an opportunity to protect themselves by such enquiry as they might have made as to Beck's equities against Harman. They admit that it is firmly settled that the assignee of a bond stands in the shoes of the assignor, but claim that it is equally well settled that he does not stand in the same relations to, and does not take subject to a latent equity residing in a third person.

In the case of *Murray* v. *Lylburn, supra,* the court, after speaking of the relations of the assignee and the obligor, as referred to above, says: " But this rule is generally understood to mean the equity residing in the original obligor or debtor, and not an equity residing in some third person against the assignor. The assignee can always go to the debtor and ascertain what claims he may have against the bond, or other chose in action which he is about purchasing from the obligee. But he may not be able, with the utmost diligence, to ascertain the latent equity of some third person against the obligee. He has not any object to which he can direct his enquiries, and for this reason the claim of the assignee was preferred in the late

case of *Redfern* v. *Ferrin,* 1 Dow., Rep. 50, to that of a third party setting up a secret equity against the assignor. Lord Eldon observed in that case, that "if it were not to be so, no assignments could ever be taken with safety. I am not aware that this decision was the introduction of any new principle in the case of actual *bona fide* purchases or assignments by contract, though Lord Thurlow said in one case—*Darris* v. *Austin,* 1 Vesey, p. 249—that the purchaser of a chose in action must abide by the case of the person from whom he buys; but he spoke this in a question between the assignee and the debtor."

In the case of *Murray* v. *Ballou,* 1 Johns. 581, the chancellor, after disposing of the questions concerning the right of Ballou, the vendee, by a *pendente lite* sale to the land, remarked: "The suit is also against Hunt, the assignee of the bond and mortgage given by Ballou, and the counsel for the plaintiffs seek either the land or the proceeds of the sale, and appear to be equally willing to accept of either. Hunt purchased the bond and mortgage, as he says, without knowing or inquiring as to the considerations for which they were given; and though he took them subject to all the equitable claims of Ballou, yet, as between him and the plaintiffs, the question may not be the same, and I think it will be unnecessary for me to decide, at present, whether the doctrine of this case reaches him so as to protect from assignment all the bonds and other securities taken by Winter in his character of trustee."

This point underwent much discussion in the House of Lords in *Redfern* v. *Ferrin, supra,* and it was there held on appeal in a Scotch case, *that a latent equity in a third person* shall not defeat a *bona fide* assignee of a right without notice, except it be an assignment by an execution which carried on the face of it notice of his fiduciary character.

In the case of *Gordon* v. *Rixey,* 76 Va., 694, this court, citing

and approving *Moore* v. *Holcombe, supra,* held that an assignee cannot be affected by a latent equity in the hands of a third person, of which he has no notice; that the secret implied lien of the vendor was a mere creation of the courts of equity, and could not be used to the injury of third persons who had been misled by the conduct of the original vendor.

We have seen that so far as the rights of the obligor are concerned, the assignee stands in the shoes of the assignor, and must answer as to the equities of the obligor against the assignor. If the bond was given for a consideration which failed, or for property, the title to which has proved unsound, the obligor may have redress against the bond though in the hands of an innocent assignee, without notice, as fully as he could have against the obligee. But the assignee does not take subject to a latent equity residing in a third person.

We have seen the sort of claim which fell under the description of a latent equity residing in a third person in *Moore* v. *Holcombe,* in *Murray* v. *Lylburn, Murray* v. *Ballou, Redfern* v. *Ferrin,* and other cases cited, *supra.*

The principle involved is so well established that it must be regarded as a canon of property. What has been said thus far applies to cases of an implied lien where there has been a conveyance to the purchaser of the legal title.

Under our law now, since the Code of 1849, section one, chapter 119, this equitable vendor's lien does not exist. The Code provides that, if any person hereafter convey any real estate, and the purchase money, or any part thereof, remain unpaid at the time of such conveyance, he shall not thereby have a lien for such unpaid purchase money, unless such lien is expressly reserved upon the face of the conveyance. The statute abolishes the lien where the vendor has conveyed the legal title, and has not reserved it upon the face of the conveyance. It does not apply to the case where the title has

been retained by the vendor. In such case the courts have held that a natural equity arose from his having the title deeds in his custody.

Among the circumstances to repel the presumption of an intention to resort to the estate, is the making of a conveyance of the legal title—a circumstance always sufficient to repel the presumption as against a *bona fide purchaser from the vendee having the legal title.* But a purchaser or incumbrancer of a mere equitable title must take the place of the person from whom he purchases.

The vendor may resort to the estate whether a purchaser of the mere equitable estate from his vendee, *purchased with or without notice.* For want of notice, or the payment of a valuable consideration, cannot place him in a more advantageous position than his vendor. That a vendor retaining the legal title occupies a position different from and higher than one who has parted with the legal title, and relies on the mere implied equitable lien, is clear from the authorities. *Yancey* v. *Mauck,* 15 Gratt. 307.

In the case of *Lewis* v. *Caperton,* 8 Gratt. 148, it was held that the vendor retaining the legal title may resort to the land as against creditors and incumbrancers of the vendee, although the vendee had subsequently executed a deed by which he conveyed other property to secure the purchase money.

In *Brush* v. *Kinsley* and *Adams* v. *Stillwell,* 14 Ohio R. 20, the distinction is drawn between the implied lien when the legal title is parted with, and the right of the vendor who has retained the title to enforce a specific execution. The judge says: "The lien of the vendor results from the fact that equity holds the vendee, clothed with the legal title, a trustee of the vendor for the payment of the purchase money. Before the legal title passes from the vendor on a contract for the sale of land there is no such lien. The vendor's remedy in such case is

on the contract. The vendee cannot compel a relinquishment of the legal title until he clothes himself with equity by the payment of the purchase money."

In *Clark* v. *Hall*, 7 Paige, 382, it was held that where there is an unexecuted contract of sale, the vendor may file a bill to have specific execution, and have the land sold for his debt. See also *Kinsley* v. *Williams*, 3 Gratt. 265, and *Hanna* v. *Wilson, Id.*, 243. In the latter case it was held that although an action on the promissory note given for the purchase money might have been barred at law, yet as the vendor retaining the title might sue in ejectment at law, or file a bill in equity for specific execution, and subject the land in default of payment, his right in equity was not affected by any lapse of time short of the period sufficient to raise the presumption of payment, whatever might be the operation of the statute of limitations in an action at law instituted upon the promissory note. And the intervention of a purchaser without notice, or a *bona fide* incumbrancer, does not obstruct the right of the vendor to charge the land. *Stewart* v. *Abbott*, 9 Gratt. 235; *Burn's Ex'or* v. *Campbell*, 4 Gratt. 125. The latter case held that though a purchaser has obtained the legal title, and had no notice that there was purchase money due to a prevous vendor, *yet if his vendor* had not the legal title when he purchased, the land is liable* for the purchase money due to the previous vendor. See also *Hatcher* v. *Hatcher*, 1 Rand. 53; *Lewis* v. *Caperton's Ex'or*, 8 Gratt. 148; *Chapman* v. *Tanner*, 1 Vern. Rep. 267; *Macreth* v. *Symmons*, 15 Vesey R. 320; *Fawell* v. *Steeles*, Amb. R. 724; *Pollexfen* v. *Moore*, 3 Atk. 272.

Now, can Harman's vendee, Beck, claim to be a *bona fide* purchaser, without notice, of the lien of Harris? If he did not mean to content himself with the purchase of a mere equitable title, encumbered with the lien of the vendor for the unpaid purchase money, he must have required that Harman

should convey to him a perfect title; and if he did, the lien of the vendor, securing the debt due Harris, laid at the very threshold of his investigation; the very first link in the chain of the vendee's claim of title was wanting. That this defect was discovered, and the claim of Beck recognized, is not improbable; the sale having been made in 1861, and the purchase money retained by Beck for sixteen years. The circuit court in this case decided that the claim of Harris to subject the Beck lot to the payment of his debt, or to have the same satisfied out of the unpaid purchase money, must be sustained; that the lien of Harris is prior and superior to the claim of Stoner. That Harris has the right to subject the land to the payment of the purchase money secured by the retention of the title by the vendor, cannot be doubted. Harman had only an equitable title which he could convey; the deed standing in his name did not increase his rights under the circumstances in any degree.

It seems that the chief difficulty which has been encountered in this case by the learned counsel, who have argued it with so much ability, and at such unusual length, grows out of the circumstance that the original vendor, Harman, who sold to Pitman in 1853, bought at the sale ordered by the court in the suit to subject this land to the payment of the debts of Pitman, including the purchase money for this land, and to settle up the Pitman estate, coupled with the circumstance that the deed to Harman was made to him by his original vendors, *after* his sale to Pitman.

Harman has never obtained a deed under his purchase from the court in the Pitman suit, because he has never paid the purchase money due to Harris. Harris has been guilty of apparent laches in the collection of his debt, and if he knew of the sale to Beck, of which, however, there is no proof, his failure to give him notice might be held to be inexcusable.

But the sale to Beck was by parol, and it is probable, certainly possible, that Harris knew nothing of it until the Beck suit was instituted, and he did not appear to take any part in the matter until the commissioner's report was made and the liens reported; and after all this he merely caused a suggestion to be made to the court that he had a prior lien, when his claim seems to have been reported without serious controversy, until the exception, which was afterwards filed to this report on account of the allowance of his claim. If his debt is lost, it must be because of his long neglect to enforce the *collection* of his debt, to the injury of others. He cannot be charged with any laches in the presentation and prosecution of his claim to decree against Harman. Harman sold to Pitman August, 1853, Pitman died March, 1855, and Harman obtained the deed from Sterritt & White November, 1855. In 1857 Harman bought the land at the judicial sale, and a decree was entered in the cause directing Harman to pay the debt due Harris, which was part of the purchase money. Without paying this, Harman sold, in 1861, to Beck, by parol, and in 1863 that cause was removed from the docket. From this time for eighteen years the papers were lost, and not found, and in the meantime Harman assigned the bond of Beck, and 1876 died, and Beck has also died, and in 1876 the court decreed a sale of the Beck lot.

Harris not being able for two years to find the papers in the Pitman suit, procured an order in the court in that cause in 1873, for a rule against Harman to show cause why his land should not be resold to pay the purchase money. Harman obviously has no rights as to this land other than such as he acquired at the judicial sale. He repurchased, and so the equitable right then acquired was held by the same person who seemed to have the legal title; the possession and the naked title became united in the same person; but he had no better

right than he would' have had if the naked title had been in another person. The only advantage to him was one which assisted him in the practice of deception, if he so purposed. But between this Sterritt deed had been interposed two sales by him, accompanied by possession and part payment; one to Pitman, already mentioned, and one to Shry, in 1858.

The assigned bond showed upon its face that it was "for balance of house and lot lately owned by Shry." Whatever notice Beck had, it cannot be maintained that he could purchase from Harman anything but what Harman had. Harman was incapable of conveying to Beck or to any other person a good title to the lot in question. Between him and his apparent title was interposed the court's jurisdiction in a suit to which he was a party.

There has been no claim set up in this case to have the land sold to satisfy the Harris debt, obviously because Beck or his representative still owe enough to satisfy Harris' claim. If the Beck bond had been fully paid by Beck, would not Harris have a lien on the land in the hands of Beck for the payment of his debt?

Whatever deception Harman could. practice, if any, on Beck, in consequence of his apparent title, it could not be urged by Beck against Harris; it would not bear the slightest scrutiny in the light of the facts, fully known by Harris, and fully disclosed by the suit of *Pitman* v. *Pitman,* the papers in which suit are no longer lost.

We think it cannot be denied that at the time Harman sold to Beck there was a defect in the title to the land which Harman sold and Beck bought. The amount of this defect was a lien less than the purchase price. Whether disclosed to Beck then by Harman we do not know, and both are dead; but it is disclosed to Beck's representative now, and, fortunately for Beck's estate, before Beck's estate has paid for the land. As

between Harman and Beck, if both were living, would not Beck have an undoubted equity to offset his bond with so much as may be necessary to pay what his land is liable for? And if against Harman, why not against the demands of Harman's assignee, if the assignee stands in the shoes of the assignor? In *Moore* v. *Holcombe*, the deed had been made and the title passed, and no lien was reserved, and the original vendor was dependent upon an implied lien. In this case the original vendor is in no such strait; he holds the title, and, as has been said by a learned author, has no necessity for a lien.

It is admitted that Beck's estate should not be made to pay this bond twice, but the controversy is between the two lienors, both claiming the benefit of a vendor's lien. Stoner has obtained a decree to sell the land to pay his debt, and Harris has a vendor's lien superior to any right which Harman could assign.

The circuit court held that the oldest vendor's lien had priority in a contest between the two. A contrary decision would have been, in effect, to decree against Beck's payment of the purchase price of a defective title, and involved the payment of the purchase money twice on the part of Beck.

Harris is not asserting any equity against an assignee, to whom he is a stranger; he is not asserting any equity against the assignee of any sort; his claim is against the land in the hands of Beck, and between him and Stoner it is a conflict of liens, in which his prevails, because it is prior in time and superior in right.

Harris does not seek to enforce the collection of the Beck bond; his claim is to the land, and Beck's equity is against the bond in the hands of every assignee, good, because it was a good offset against the original assignee; and Stoner has no greater right than his assignor, Harman, had, and Harman could not collect the bond until the title to the land was per-

fected, and this can only be done by paying the purchase money due by Harman. Harman having assigned the bond to Stoner, Stoner must stand in Harman's shoes when he seeks to collect the bond of Beck.

We think the decree of the circuit court was right, and the same must be affirmed.

DECREE AFFIRMED.