# Staunton.

## BOWLES v. COMMONWEALTH.

### September 29, 1904.

1. CRIMINAL LAW—*Change of Venue—Local Prejudice.*—This court will not reverse the ruling of a trial court refusing a change of venue in a criminal case, on account of local prejudice, when the affidavits. of the prisoner and his counsel in support of the change represent. the hostility to the prisoner as existing in one corner of the county, where the offence was committed, eleven miles from the county seat, and not widespread throughout the county, and it appears. that little or no difficulty was experienced in getting a jury in the county to try the case, and the record does not disclose such a. condition at the time of trial as would warrant the apprehensions. expressed in the affidavits when they were made.

2. CRIMINAL LAW—*Jury from Another County.*—This court will not reverse the ruling of a trial court refusing to order a jury from another county to try a criminal case, when it appears that an impartial jury was in fact obtained in the county fixed for the trial.

3. EVIDENCE—*Res Gestæ—Dying Declaration—Hearsay.*—On a trial for homicide the statements of deceased made a few minutes after receiving a mortal wound are admissible as part of the *res gestæ*, but statements made six hours afterwards, not in view of approaching death, are mere recitals of a past occurrence, and are not receivable. The deceased is no party to the prosecution, and the State is not bound by his recital of the circumstances of the homicide not receivable as a dying declaration, nor constituting part of the *res gestæ.*

4. EVIDENCE—*Christian Character to Refute Evidence of Profanity.*—On a trial for homicide, evidence of the character and habits of the deceased in not using vulgar and profane language, and of his general good character and church membership, is not receivable to contradict the evidence of the prisoner that the deceased, when approaching him, used violent and profane language.

5. INSTRUCTIONS—*Partial View of Evidence—Assuming Facts When Evidence is Conflicting.*—On a trial for homicide, an instruction which gives the Commonwealth's theory as to the manner and circumstances of the killing, and which wholly omits any reference to the evidence of the prisoner as to what was the conduct of the deceased and of himself at that time, is erroneous. So also, an instruction which assumes the existence of facts as to which the evidence is conflicting, is erroneous. The jury are the sole judges of the weight and credibility of evidence, and are to consider all the evidence adduced by the Commonwealth and the accused, and an instruction which excludes from their consideration evidence of the accused in conflict with that of the Commonwealth, is erroneous, although the accused is supported by no other witness.

6. INSTRUCTIONS—*Covering Whole Case—Omitting Essential View.*—An instruction which undertakes to cover the whole case and to state all the circumstances and conditions necessary to be considered by the jury in arriving at their verdict, and which omits an essential view of the case, is erroneous.

7. INSTRUCTIONS—*Effect of Refusal.*—Generally, instructions are argued before the court, in the absence of the jury, and where an instruction has been refused by the trial court, the sole question to be considered by this court is whether or not it was properly refused, and not the effect of its refusal.

8. CRIMINAL LAW—*Homicide—Heat of Passion—Instructions—Evidence to Support.*—On a trial for homicide, an instruction which tells the jury that if they believe that the prisoner shot the deceased in the heat of passion, brought about by the circumstances then surrounding him, and without a wilful, deliberate and premeditated intention to take the life of the deceased, they cannot find him guilty of murder of the first degree, correctly states the law, and if supported by any evidence in the cause, though it be that of the accused alone, should be given.

9. CRIMINAL LAW—*Instructions—Conflicting Theories as to Motive.*—Where evidence has been introduced in a criminal prosecution tending to sustain opposite theories as to the motive which induced an assault, and the jury has been instructed upon the theory of the Commonwealth, it is error to refuse an instruction offered by the prisoner setting forth the law upon his theory of the case.

10. CRIMINAL LAW—*Homicide—Reasonable Apprehension—Instructions—Evidence to Support.*—On a trial for homicide, an instruction which tells the jury that if they believe from the evidence that the intention of the deceased, as evidenced by certain enumerated acts, was to make an attack on the prisoner, or to create on his mind the

impression that the deceased intended to make an attack on him, and that the manner or acts of the deceased were such as to create on the mind of the prisoner the impression that an attack was going to be made upon him; or that the prisoner did, in fact, believe that an attack was going to be made on him by the deceased, and that he thought he was in danger of serious bodily harm at the hands of the deceased, and that the prisoner shot the deceased in order to save himself from serious bodily harm, that then the prisoner was not guilty of murder of the first degree, correctly propounds the law, and should be given upon request, if supported by any evidence in the case, though it be that of the accused alone.

11. CRIMINAL LAW—*Trial—Applause in Court Room.*—Applause by the audience of remarks made by the prosecuting attorney in a criminal case are derogatory of the dignity and authority of the court and well calculated to make impressions upon the jury prejudicial to the accused. In the case at bar, however, the prompt and vigorous rebuke and warning of the trial judge were sufficient to prevent its recurrence, and the trial was not vitiated thereby.

12. CRIMINAL LAW—*Trial—When and What Papers to be Given to Jury.*— On a criminal trial the indictment, the written instructions of the court, or other writings proper to be given into the hands of the jury, upon their retirement from the presence of the court, or afterwards, should be delivered to them in the presence of the prisoner and his counsel, in order that objection, if there be any, may be made.

Error to a judgment of the Circuit Court of Alleghany county, rendered on a verdict, finding the plaintiff in error guilty of murder of the first degree.

*Reversed.*

The opinion states the case.

*Benjamin Haden* and *Wm. R. Allen,* for the plaintiff in error.

*Attorney-General William A. Anderson,* for the Commonwealth.

CARDWELL, J., delivered the opinion of the court.

The plaintiff in error, Robert Bowles, was indicted in the

Circuit Court of Alleghany county for the murder of one John Ruff, found guilty by a jury, and sentenced to be hanged, whereupon he obtained this writ of error from one of the judges of this court.

The prisoner and the deceased were both in the service of the C. & O. Ry. Co. at Clifton Forge. The latter had been in the service of the company for some time as a fireman on the James River Division, while the first named had only been in the employment of the company for two days, as yard brakeman at Clifton Forge. They were entire strangers to each other prior to the altercation which resulted in the death of the deceased, not having seen each other prior to that occasion.

The train on which the deceased was fireman was scheduled to leave Clifton Forge about 2:30 o'clock on the morning of March 21, and the engine which was to convey this freight train had been brought by some of the crew of that train so near to the lead track, and there stopped, that any other train passing along the lead track would, to the ordinary vision, strike this engine in passing. The prisoner was engaged to aid in the movement of another train, in charge of Yard Conductor Albert White, which was being backed along this lead track, and was passing along the track by the engine on which the deceased then was. The prisoner was sent ahead of the rear part of this train to ascertain whether there was anything on or near the track which would interfere with the movement of Conductor White's train, which was then in motion, going towards the engine on which the deceased was. It appeared to the prisoner, as well as to Conductor White, that the engine at the time in charge of the deceased, was so close to the lead track that Conductor White's train would strike it in passing, whereupon he called out to the deceased to "move that engine quick; if you don't we are going to hit it." At the same time the prisoner signalled Conductor White and the engineer of

his train to "shut off," or stop that train, and Conductor White, apprehending that the engine in charge of the deceased would interfere with his train, "shut off" and stopped it promptly. The deceased, taking offense at the language or order given him by the prisoner, got down out of his engine and advanced to within a few steps of him, and demanded to know what he meant by it, meaning the language used, or the order given, and some words passed between them; whereupon the prisoner laid down a brake stick that he had in his hand, also his lantern, and, drawing a pistol from his pocket, fired five shots in quick succession at the deceased, two of which took effect, and from the injuries resulting therefrom he died the following night.

The foregoing facts are testified to by the witnesses for the Commonwealth, upon the theory advanced by the Commonwealth, that the homicide was wilful, premeditated and deliberate, without any provocation or justification; while the prisoner testified that to save his life and protect himself from serious bodily harm, in warding off an unprovoked and murderous attack which the deceased was making upon him, he killed the deceased in self-defense.

The first assignment of error is to the refusal of the Circuit Court to order, on motion of the prisoner, a change of venue. To support this motion, the prisoner offered his own affidavit, another by his counsel, who were present to defend him, Messrs. Allen & Haden, and another by Mr. C. B. Cushing, whom the court had assigned to defend the accused, and who only withdrew as counsel for the prisoner on the day on which the prisoner made his affidavit, that being the day on which Messrs. Allen & Haden, employed by the prisoner, took charge of the defense.

The affidavit of the prisoner (a colored man) sets out that it was impossible for him to have a fair and impartial trial in the county of Alleghany; that the newspapers of that county had

Opinion.

published severe and damaging articles against him; that the
deceased was a white man, who, with his family, lived at Clif-
ton Forge, in the employment of the C. & O. Ry. Co., and a
member of a railway organization to which most, if not all,
of the employees of said company in said county belonged;
that a large number of these railway employees and their fami-
lies lived in the county of Alleghany; that the prisoner had
been residing in the State of Pennsylvania until a few days
prior to the commission of the offense charged against him;
that public feeling in the county of Alleghany against him
was so strong that the officer from Alleghany county who took
him in charge in the State of West Virginia (where he had
fled immediately upon the committing of the offense charged)
along the line of the Chesapeake & Ohio railway, deemed it
unsafe for the prisoner to be carried into, or even through, the
county of Alleghany, and had conveyed him across the country
in a buggy to the N. & W. railway, and over that railway to
Lynchburg; that the prisoner was kept in jail at Lynchburg
because it was deemed unsafe to carry him to, or even through,
the county of Alleghany; that on account of the widespread
public feeling against the prisoner, it was deemed unsafe to
bring him to that county, except under the protection of the
military forces of the Commonwealth; that the judge of the
court in which he was to be tried refused to conduct this trial
in the presence of military forces, and that then, in order to
bring the prisoner to that county for trial, a public meeting
of the citizens of the county was held, to give assurance to the
officers of the county that they could convey the prisoner from
Lynchburg to Covington, the county seat, for trial, without
his being attacked on the road; that this feeling against the
prisoner continued to be so bitter and widespread that predic-
tions were then being made, and threats uttered, that if the
jury should find the prisoner guilty of an offense less than

murder in the first degree, the prisoner would be lynched before he could be carried from the courthouse to the jail.

The affidavit of Messrs. Allen and Haden is practically the same as that of the prisoner, with the exception of the statement that, on the night of April 13, 1904, at the public hotel at Clifton Forge, they overheard a conversation among a number of gentlemen, in which it was stated that if the jury, on the trial of the prisoner, should bring in a verdict for a less offense than murder in the first degree, the prisoner would not be allowed to be taken back in safety to the jail; and that affiants were deeply impressed that any trial of the accused in that county at that time would be mere mockery, and that it would be utterly impossible to secure for the prisoner a fair and impartial trial in that county within any reasonable time.

The conversation heard by these affiants in the hotel is not shown to have been threats against the prisoner, nor that those persons engaged in the conversation had heard threats made against him, nor of a purpose to lynch him under the circumstances stated. The sum and substance of the conversation was the expression of an opinion merely, as to what would occur in a certain event.

The affidavit of Mr. C. B. Cushing is merely to the effect that the statements contained in the affidavit of the prisoner are, as he verily believes, true in every respect, and adds no statement of facts within his own knowledge, upon which to rest his belief that the statements of the prisoner are true, or his fears of violence well founded.

In view of the fact that the excitement and hostility towards the prisoner, recited in these affidavits, is represented as existing in the town of Clifton Forge, where the offense was committed, and not widespread throughout the county of Alleghany; that in fact Clifton Forge is in the northeastern corner of the county, some eleven miles from Covington, the county

seat, where the trial took place; and that little or no difficulty was encountered in securing a panel from which a jury was selected to try the prisoner; we do not think that a case was made for a change of venue. Only sixty persons were necessary to be summoned in order to secure the panel, and there is not shown in the record such a condition of the public mind at the time of the trial as would bear out the apprehensions felt by the prisoner and his counsel at the time their affidavits were made.

In *Muscoe's case,* 87 Va. 462, very much the same case had been made as was made in this case for a change of venue, but the court held that it was insufficient, the opinion quoting from Judge Daniel in *Wormeley's case,* 10 Gratt. 672, where it was said: "It may be safely affirmed that the mere affidavit of the prisoner of his fears or belief, that he cannot obtain a fair trial in the county, is not sufficient to sustain the motion (for a change of venue); but that he should be required to show, by independent and disinterested testimony, such facts as make it appear probable, at least, that his fears and belief are well founded."

The law has provided the test as to the fitness of a person to sit upon a jury in the trial of criminal cases, and if, by applying this test, an impartial jury was in fact secured in the county where the trial was to take place, a conclusive presumption arises that the motion for a change of venue was unfounded. *Wright* v. *Commonwealth,* 33 Gratt. 880; *Joyce* v. *Commonwealth,* 78 Va. 289; *Waller & Boggs* v. *Commonwealth,* 84 Va. 496, 5 S. E. 364.

What we have said with respect to the motion for change of venue is conclusive of the question presented by the second assignment of error, which is to the refusal of the Circuit Court to order a jury from another county.

The third assignment of error is to the refusal of the court

to grant the prisoner a continuance, but as this case will have to be sent back on other grounds for a new trial, it becomes unnecessary to consider this assignment.

Conductor White, examined as a witness on behalf of the Commonwealth, and who was the first person to reach the deceased after he received his injuries at the hands of the prisoner, and but a few minutes after the occurrence, having testified that he then and there asked the deceased what he had said to the prisoner, the deceased replied, "I just asked him what he meant by it, and that is all the words I ever had with him," the prisoner introduced Dr. J. C. Wysor, and sought to have him relate to the jury a conversation which he had with the deceased at the hospital, about six hours after he was shot, to the effect that the deceased, in answer to a question propounded by the witness as to how the difficulty occurred, said that he had been called to go out and was at his engine, and while he was standing on the engine this man (the prisoner) came down through the yard on another engine, and yelled out to him to get off the "lead" so he could pass; that he (the deceased) explained to him (the prisoner) why he couldn't do that; that then the prisoner gave him a lot of "sass," and he (the deceased) asked him if he knew who he was talking to, to which the prisoner replied, "Yes; I know who I am talking to"; that deceased then said, "It seems to me you don't," and that the prisoner kept on "jowering" at him for some time, and finally called him a liar; that he (the deceased) thought he would take the coal pick and knock him on the head; that he started towards the prisoner and he shot him (the deceased) five times, but that he (the deceased) had no idea that he was going to shoot him, and he wouldn't have hit the prisoner with the coal pick, because he never had a difficulty with a man in his life. To the introduction of this evidence the Commonwealth objected, which objection was sustained, and the state-

ment of the witness, Wysor, ruled out. This constitutes the prisoner's fourth assignment of error.

No dying declaration was introduced or attempted to be introduced in evidence, and the statement which the deceased made to the witness, White, was admitted in evidence as a part of the *res gestæ*. It is needless to cite authority to show that the statement, testified to by the witness, White, was properly admitted as a part of the *res gestæ*, as it was so connected with the shooting of the deceased under investigation as to constitute a part of it.

As has been observed, the statement made by the deceased, which the prisoner desired to have the witness Wysor relate to the jury, was made six hours after the deceased had been shot, and was but a narrative of a past transaction, and, as we will presently show, was mere hearsay. It further appears that the statement of Dr. Wysor is that the deceased was not at the time conscious of impending death, but, on the contrary, expressed confidence that he would soon recover, and, therefore, the declarations of deceased to him could not have been introduced as dying declarations, had they been so offered.

In *Commonwealth* v. *Densmore*, 12 Allen, 535, it was held that "on a trial of an indictment for manslaughter committed in an affray, declarations of the deceased made several hours after receiving the injury from which he died, though not made in view of approaching death, were not admissible as evidence in favor of the defendant for the purpose of showing the circumstances of the affray." The opinion in that case, after showing that the statements of the deceased were neither part of the *res gestæ*, nor a dying declaration, says: "But aside from this we do not see that the deceased stood in any such relation towards the Commonwealth as to render his declarations admissible as evidence. It cannot be properly said that in the prosecution of offenses, *mala in se*, the Common-

wealth asserts a private right, or maintains an individual interest, in any such sense as to be affected or bound by hearsay statements of those who may have been the victims or objects of a criminal act on their property or person. There is no such legal identity or privity between them and the Commonwealth as to render their statements admissible in behalf of those who are charged with the commission of a crime." See also *People v. McLaughlin*, 44 Cal. 435; *Powers v. State*, 87 Ind. 151.

In the last named case, ·the opinion says: "During the trial, appellant offered to prove that, on the morning after the injury, Hougham, the injured person, said to appellant, in the presence of the witness, that appellant did not hit him with a rock on the night before, but that another party did, etc. This was excluded; appellant excepted, and made the ruling one of the causes for a new trial. This ruling is brought to our attention in counsel's brief, but no authorities are cited. Clearly the court committed no error in excluding the offered testimony."

The argument, that if the evidence of Dr. Wysor had been admitted, it would have had a tendency to repel the claim of the Commonwealth, that the offense charged against the prisoner was murder in the first degree, cannot avail. A case well in point is *State v. Curtis*, 70 Mo. 597, in which Powell, Curtis and Stoner were together in a room and in some manner the light was extinguished, and a struggle ensued in the dark, in which Powell was mortally wounded by being stabbed. Immediately after the stabbing, and before Powell left the house, he declared that Curtis cut him. This declaration was admitted on the trial as a part of the *res gestæ*. At the trial Curtis offered to prove by the sheriff that he arrested Stoner and took him to Powell's room on the morning after the stabbing, and that Powell recognized Stoner as the man who cut him. Thus it will be seen that a declaration of the wounded man to the effect that Curtis had stabbed him, was admitted

as a part of the *res gestæ*, but a statement made by him the next morning, that it was Stoner who stabbed him, was excluded, and if the statement had been admitted its tendency would have been to exculpate Curtis altogether. The opinion of the court said: "The statements of the deceased, on the morning after the difficulty, identifying Stoner as his assailant, were properly rejected. They were not made *in extremis*, and, indeed, were not offered as dying declarations, and hence, were not admissible on that ground. Nor could they, in any point of view, be regarded as the declarations of a party to the record, or as binding upon the State. In criminal prosecutions the State sustains no such relation to the party injured as will render his declarations admissible in evidence against the State. . . . Nor were the declarations of the deceased admissible as part of the *res gestæ*. . . . The statement sought to be introduced was not made until nearly four hours had elapsed after his return to consciousness on the morning of the 28th. So that there was no such continuing unconsciousness from the time when the wound was inflicted to the time when the declaration was made, as would render such declaration a part of the *res gestæ*, even on the theory contended for by the defendant."

Bishop, in his work on Criminal Procedure (3 Ed.), Vol. 2, sec. 623, says: "The deceased person is not a party to the prosecution, and his utterances are hearsay to the same extent as those of any third person. Nor, except as to dying declarations, does the fact that he is dead render admissible what would not be if he had survived, and the prosecution were for the battery. However desirable it may be to show what were his mental condition and purposes at a particular time, the rules of evidence cannot be violated; and if death has removed the witness, the case is the common one of lost evidence, the recovery whereof is beyond human power. The declarations

of the deceased, as of any other third person, when not of the *res gestæ*, or dying declarations, or communicated to the defendant so as possibly to influence his conduct, are excluded by rules which have been supposed to promote justice on the whole, at all events, which have become parts of the common law, not within the discretion of the courts to set aside. Hence they are not admissible."

In Vol. 1, sec. 1082, the same learned author says: "In criminal causes, the State that can make no confessions or admissions, is the plaintiff. . . . The prosecutor or the person injured is not a party, and evidence of his utterances is hearsay only, precisely as of any third person. If what he has said becomes important, he must be called as a witness; and if his testimony differs from his declarations *in pais*, they may be shown merely to discredit him. If he is dead, the evidence is lost, the same as when any other witness dies."

The authorities cited on behalf of the prisoner are not, so far as we have been able to examine them, in point. In *Puryear* v. *Commonwealth*, 83 Va. 55, 1 S. E. 512, where a note was written by the wife of the accused, indicating her intention to commit suicide, it was held to be admissible evidence when offered by the accused, but it was admitted only as evidence to repel proof of the *corpus delicti*. We have found no case or text-book that sustains the contention of counsel for the prisoner, and we are of opinion that the proffered statement of Dr. Wysor was rightly excluded.

The prisoner, having testified that the deceased, when approaching him, used violent and profane language, evidence of the character and habit of the deceased in not using vulgar and profane language, and of his general good character and church membership, was admitted on behalf of the Commonwealth over the prisoner's objection, and this ruling of the court constitutes the fifth assignment of error.

We have been unable to find any authority which sustains the view of the Commonwealth as to the admissibility of the evidence here objected to, and we are of opinion that this assignment of error is well taken.

The action of the trial court in giving certain instructions at the instance of the Commonwealth is made the basis for the prisoner's sixth assignment of error.

There were ten instructions given on behalf of the Commonwealth, but no objection is pointed out, and we can see none, as to nine of them, numbered from one to nine, inclusive. Each of them embodies a proposition of law repeatedly sanctioned by this court.

The tenth instruction is as follows:

"That if the jury believes, from the evidence, beyond a reasonable doubt, that, at the time of the killing charged in the indictment, the accused, acting as brakeman on the yard of the Chesapeake & Ohio Railway Company at Clifton Forge, came up to a point near the engine on which the deceased was acting as fireman, and directed the deceased to move said engine in order that the train that was approaching might safely pass through the switch near by; that the manner in which the prisoner made the request of the deceased, or the language used in making such request, was offensive to the deceased; that the deceased thereupon got down off his engine and walked around to a point near where the accused was standing and asked the accused what he meant by what he had said to him, the deceased; that the accused set down a lantern, which he had in his hand, and laid down a brake-stick which he had in his hand, and thereupon drew a pistol from his pocket and shot the deceased, giving to him a mortal wound, from which said mortal wound he (the deceased) the following day died, as charged in the indictment; such killing was wilful, deliberate and premeditated, and as such is murder in the first degree."

This instruction is, we think, clearly erroneous. First, it leaves out of view wholly any consideration by the jury of the manner in which the deceased approached the prisoner, whether in a violent and threatening manner, or whether he approached him in a peaceable manner, not calculated to cause the prisoner to apprehend that the deceased would make an assault upon him. Second, it assumes the existence of facts, as to which there was a conflict of evidence—that is, it assumes that the prisoner set down a lantern, *which he had in his hand*, and laid down a brake-stick, *which he had in his hand*, and thereupon drew a pistol from his pocket and shot the deceased, etc., when the prisoner had testified that he did not so act, and that the deceased not only advanced upon him in a violent and threatening manner, but knocked him down with a club, or some other weapon, and was continuing the assault when he shot the deceased. And, third, it in effect tells the jury that upon their finding the facts stated in the instruction proven beyond reasonable doubt, they should find the prisoner guilty of murder in the first degree, when the facts stated in the instruction, if found by the jury to be the facts established by the evidence, do not necessarily constitute a wilful, deliberate and premeditated murder. It was evidently the purpose of the instruction to set out the Commonwealth's theory as to the manner and the circumstances of the shooting of the deceased, and wholly omits any reference to the evidence of the prisoner as to what was the conduct of the deceased, and his own conduct, at the time of the shooting.

It is axiomatic that the jury are the judges of the weight and credibility of the evidence, and in reaching their conclusions they must take into consideration all of the evidence adduced, whether by the Commonwealth or by the prisoner, and where an instruction given is intended to present the theory of the prosecution as to the motive which induced the commis-

sion of the crime charged, the instruction, if so framed as to
exclude from the consideration of the jury the evidence of the
accused tending to show a different state of facts from those
stated, is erroneous and constitutes reversible error.

In this case the prisoner had testified as to facts and circum-
stances surrounding the shooting of the deceased, which, if be-
lieved by the jury, would have made the homicide an offense
less than that of murder in the first degree, and it was for them
to say whether these facts and circumstances were true or not,
although they were not testified to by any witness other than
the prisoner himself.

As was said by the court in *Allison* v. *U. S.*, 160 U. S. 203,
16 Sup. Ct. 252, 40 L. Ed. 395: "Justice and the law demand
so far as reference was made to the evidence, that that which
was favorable to the accused should not be excluded." And
the same court said in *Wallace* v. *U. S.*, 162 U. S. 475, 16
Sup. Ct. 859, 40 L. Ed. 1039: "Necessarily it must frequently
happen that particular circumstances qualify the character of
the offense, and it is thoroughly settled that it is for the jury
to determine what effect shall be given to circumstances having
that tendency, whenever made to appear in the evidence."

As we have seen, the theory of the prisoner's defense was
that to save his life or to protect himself from serious bodily
harm in warding off an unprovoked and violent attack which
deceased was making upon him, he shot the deceased, and if,
as we have said, the facts and circumstances which he testified
to were believed by the jury, he could not have been found
guilty of murder in the first degree. It will not do to rest this
tenth instruction, as given, upon the assumption that the jury
could not believe from the evidence the facts stated in the in-
struction if they attached any credit whatever to the prisoner's
statement. Nor can the instruction be sustained upon the rule
that any evidence tending to support a state of facts is suffi-

cient to justify the court in giving an instruction applicable thereto. This would be a total misapprehension of that rule; nor can it be sustained upon the rule that the instructions must be taken as a whole, and any defect in an instruction may be cured by another instruction given; nor the rule that if the court can see from the whole record that no other verdict could have been found than that rendered by the jury, had there been no error in the instructions, it will not reverse the judgment because of an erroneous instruction given.

In *N. & W. R. R. Co.* v. *Mann*, 99 Va. 180, 37 S. E. 849, an instruction was given which left out of view the primary contention of the defendant and fastened upon it responsibility to the plaintiff, and in the opinion by Keith, P., it is said: "It is true that there are other instructions given by the court which tell the jury that they must be satisfied that the injury was the result of the defendant's negligence, and we have then inconsistent instructions. Not only inconsistent instructions, but an instruction which, undertaking to cover the whole case and to state all the circumstances and conditions necessary to be considered by the jury in arriving at a verdict, leaves out of view an essential view of the case."

The prisoner asked for thirteen instructions, of which Nos. 4, 7, 7-a, 8, 9, 10 and 12 were rejected, and their rejection constitutes the prisoner's seventh assignment of error.

We shall not undertake to review these rejected instructions, as they, with the exception of Nos. 7-a and 8, were in our judgment properly refused.

Instruction No. 7-a is as follows:

"The court instructs the jury that if they believe, from the evidence, that the prisoner and the deceased became involved in a sudden quarrel, without any previous ill-feeling, or bad blood between them, and that the prisoner used insulting language to the deceased, and that the deceased came down out

of the cab of his engine and started towards the prisoner, either with the purpose of resenting the said insults, or of asking the prisoner what he meant by the language he had used towards him, and that the prisoner then shot deceased in the heat of passion, brought about either by the quarrel in which they had been engaged, or by the deceased advancing upon him, or that the shooting was not done with the wilful, deliberate and premeditated intention to take the life of the deceased, or to do him serious bodily harm, then they cannot find him guilty of murder in the first degree."

We attach no importance to the effect of the refusal to give an instruction, so earnestly contended for by counsel. Presumably, in accordance with the usual practice, instructions are considered by the court in the absence of the jury, and the sole question to be considered by this court, where an instruction has, under those circumstances, been refused, is whether or not the instruction was properly refused.

This instruction 7-a contains practically the same proposition of law embodied in instructions approved by this court in *Honesty's case*, 81 Va. 294, and frequently approved in subsequent decisions, which is, that if the jury believe that the prisoner shot the deceased in the heat of passion, or that the shooting was not done with the wilful, deliberate and premeditated intention to take the life of the deceased, or to do him serious bodily harm, it was not murder in the first degree. It seems that the refusal of the instruction was not based upon the contention that the evidence did not contain the facts assumed in it, but that the conclusion of law from those facts as announced in the instruction was erroneous. It also seems to be admitted that there was no ill-feeling between the parties; that the prisoner used language that offended the deceased, and that the deceased came down out of the cab of his engine and started towards the prisoner, and while advancing towards

him inquired of him what he meant by the language he had used. At all events, the evidence was without conflict as to these facts, while the prisoner claimed that the deceased was not only armed with a dangerous weapon, a club, but, in fact, struck him and knocked him down on his hands, following this blow with others while the prisoner was trying to get away, before he drew his pistol and shot. It is true that this statement of the prisoner is denied by the witness, White, still we repeat that the statement was proper to be considered by the jury, and if the jury believed that the prisoner shot the deceased in the heat of passion, brought about by the circumstances surrounding him at the time, and without a wilful, deliberate and premeditated intention to take the life of the deceased, the jury could not find him guilty of murder in the first degree. Instruction 7-a being founded upon that theory of the prisoner as to the facts and circumstances attending the shooting, to which he had testified, it stated a sound proposition of law and should have been given, especially as instruction No. 10, asked by the prosecution, had been given. *Honesty's case, supra; Farish* v. *Reigle,* 11 Gratt. 697; *Jackson's case,* 96 Va. 107, 30 S. E. 452, and authorities there cited.

In the last named case, it is held that where evidence has been introduced in a criminal prosecution tending to sustain opposite theories as to the motive which induced an assault, and the jury have been instructed upon the theory of the Commonwealth, it is error to refuse an instruction setting forth the law upon the theory of the prisoner. In that case there were opposing theories as to the motive which induced the prisoner to commit the offense charged against him, and the opinion says: "There is evidence in the record tending to sustain each of these opposing theories, and the court should have given, when requested, instructions to the jury covering both aspects of the case."

The eighth instruction, rejected, assumes that the deceased became angered at what the prisoner said to him, and came down out of the cab of his engine to where the prisoner was, and told the jury that if they should believe, from the evidence, that the intention of the deceased, in thus acting, was to make an attack on the prisoner, or of creating on the mind of the prisoner the impression that the deceased intended to make an attack upon him, and that the manner or actions of the deceased were such as to create on the mind of the prisoner the impression that an attack was going to be made upon him; or that the prisoner did, in fact, believe an attack was going to be made upon him by the deceased, and that he thought he was in danger of serious bodily harm at the hands of the deceased, and that the prisoner shot the deceased in order to save himself from serious bodily harm; that then the prisoner was not guilty of murder in the first degree.

Clearly, as we think, this instruction stated a correct proposition of law, and there being evidence in the record tending to prove the facts stated therein, it should have been given. In other words, as to whether the deceased was unarmed, and approached the prisoner in no hostile manner, there is, to say the least of it, a conflict in the evidence. It is not sufficient to say that, in the face of all of the evidence for the Commonwealth, the evidence of the prisoner himself, that the deceased approached him with a coal pick or something equally dangerous, could not be believed. The authorities which we have cited clearly sustain the conclusion we have reached with reference to this eighth instruction.

The eighth assignment of error is founded upon the prisoner's eleventh exception, taken to remarks made by the attorney for the Commonwealth, in arguing the case before the jury. The remarks complained of are set out in the exception, and upon a careful consideration of them, we do not consider that they transcended the bounds of legitimate argument.

The ninth assignment of error impeaches the fairness of the prisoner's trial, on the ground that there was "loud and general" applause of a large crowd in the court-house of the remarks of the attorney for the Commonwealth, during his argument of the case.

Whether the remarks of the attorney for the Commonwealth, applauded, were, as contended in the argument here, upon an immaterial issue or not, such manifestations in the presence of the court and jury are not to be tolerated, especially in a trial which involves the life or liberty of a citizen, such conduct in the presence of the court and jury being derogatory of the dignity and authority of the court and well calculated to make impressions upon the jury prejudicial to the accused. It appears, however, in this case, that the misconduct of the spectators complained of received at the hands of the presiding judge a prompt and vigorous rebuke and warning all sufficient to prevent its recurrence; and nothing else appearing to afford ground for the belief that the fairness of the prisoner's trial was thereby affected, this assignment of error is without merit. *Doyle's Case*, 100 Va. 808, 40 S. E. 925.

The matter complained of in the prisoner's tenth assignment of error is not likely to arise again in the next trial of this cause, and therefore, it will not be further considered.

The prisoner's eleventh assignment of error is that the court, during the absence of the prisoner and his counsel, sent the instructions and indictment to the jury-room, at the request of the jury.

It appears that when the jury retired to consider of their verdict, counsel for the prisoner asked if the jury were to have the written instructions and the indictment while in charge of the officers of the court, and that the court said they might have the instructions, but not the indictment, and that at that time neither the instructions nor the indictment were given into the hands of the jury, but were handed to the clerk, the

sheriff and his deputies taking charge of the jury, and the prisoner remanded to jail; that afterwards the jury sent the sheriff to ask the court if they could have the indictment and instructions, and the court sent the indictment and instructions to the jury, the prisoner and his counsel not being present.

Upon what ground the court refused to permit the jury to take with them the indictment and the written instructions of the court, the record does not disclose. It is the universal practice in this State for the jury, when they retire to deliberate on their verdict, to take with them the instructions of the court and the indictment, and this appears to be the practice in other jurisdictions. See Bishop on Crim. Procedure (3 Ed.), sec. 982-a. Whether the sending of the instructions to the jury in the absence of the prisoner would constitute reversible error, we need not decide, as the case must, upon other grounds, be remanded for a new trial. Suffice it to say, that the correct practice is that the indictment, the written instructions of the court, or other writings proper to be given into the hands of the jury, upon their retirement from the presence of the court or afterwards, should be delivered to them in the presence of the prisoner and his counsel, that objection may be made at that time, if there be objection.

This brings us to the twelfth and last of the prisoner's assignments of error, which is to the refusal of the court to set aside the verdict and grant him a new trial. The judgment of the lower court having to be reversed for the errors pointed out and the case remanded for a new trial, we deem it inexpedient to discuss the evidence certified in the record.

For the reasons above stated, the judgment of the Circuit Court will be reversed and annulled, the verdict of the jury set aside, and the cause remanded for a new trial, to be had in accordance with the views expressed in this opinion.

*Reversed.*