# Richmond

SYLVIAN E. HUFFMAN v. COMMONWEALTH OF VIRGINIA.

March 11, 1937.

Present, All the Justices.

The opinion states the case.

*Forest T. Taylor* and *Charles Curry*, for the plaintiff in error.

*Abram P. Staples, Attorney-General,* and *Edwin H. Gibson, Assistant Attorney-General,* for the Commonwealth.

GREGORY, J., delivered the opinion of the court.

W. H. Riddle was shot and mortally wounded sometime between one and two o'clock Sunday morning, April 26, 1936, in Augusta County and carried to a hospital in Staunton where he died from the wound on Tuesday, April 28, 1936. Sylvian E. Huffman, the accused, was arrested upon suspicion on the same day of the shooting. He was indicted for the murder, tried, convicted of murder in the first degree and his punishment fixed at death.

The evidence in the case was largely circumstantial. The most important question was whether or not the accused had been identified.

The indictment was in the form provided for in Code, section 4865 (as amended by Acts 1930, ch. 238). At the trial the accused requested that a bill of particulars be furnished him and the court ordered the attorney for the Commonwealth to supply it. The bill of particulars was in this language:

"The Commonwealth, in obedience to the direction of the Court, expects to rely upon and prove the following facts at the trial of this case:

"That the defendant on the date set forth in the indictment wilfully, deliberately, maliciously, and feloniously, with a pistol or revolver previously in his possession, shot the deceased, Riddle, without provocation or justification, and inflicted upon him a wound which resulted in his death.

"That the defendant committed the murder charged in the indictment in connection with the hold-up and robbery of the deceased and took from the deceased a pocketbook belonging to the deceased and then and there in his possession.

"That the murder of the deceased by the defendant took place in the public highway at or near the filling station and residence of the deceased.

"That the defendant earlier in the night and a few hours before he killed and murdered the deceased, held up and robbed one Alexander at the store of the said Alexander, situated at Grottoes, in Rockingham County, and in connection with said hold-up and robbery used the same pistol or revolver which he later in the night used in the killing and murder of the deceased.

"That the deceased offered no provocation whatever to the defendant, but on the contrary was engaged at the time he was killed in furnishing and supplying defendant with gasoline for his automobile which was parked at a distance of more than 100 yards from the filling station and residence of the deceased."

Mr. Riddle, who was sixty-seven years of age, conducted a filling station in Augusta county on Hermitage road. His

dwelling house is situated near by. In the very early morning of the day on which he was shot he was awakened by someone who ostensibly wanted gasoline. He arose, dressed and with his purse in his possession, filled a bucket with gasoline. He then picked up the bucket and a funnel and went with the stranger in the direction of a parked 1929 Ford car.

The circumstances of the shooting are disclosed by a statement made by Mr. Riddle a very few minutes afterwards to those who heard his cries and who first reached him. This statement, which was related by two witnesses, Clyde Via and Samuel Diehl, and admitted as a part of the *res gestae*, over the objection of the accused, disclosed that Mr. Riddle was walking down the road with the stranger to the parked car. He was carrying the bucket of gasoline and the funnel and before reaching the car the stranger said "stick them up," and he immediately shot Mr. Riddle. Mr. Riddle also stated to these witnesses that he was not able to completely identify his assailant but that he was rather "heavy and short" and he had a "Charlie Chaplin" mustache and said his name was "Shiflett."

Mr. Riddle was found lying in a road leading from the Hermitage road about half way between his home and the point where the tracks of a car indicated that it had been parked.

Officer Long was called about one o'clock of that morning and he and Melvin Riddle went to the scene and were shown the place where Mr. Riddle had been lying. They found there a funnel and at Mr. Riddle's home they were shown the bucket in which Mr. Riddle had the gasoline when he was shot. This bucket had been returned to the Riddle home from the scene of the shooting by someone. The bucket at that time was nearly full of gasoline. It and the funnel were turned over to Officer Long. Long also testified that he made an examination of car tire tracks there. A sketch was made of tire tracks where a car had been parked a short distance from an intersecting road nearby.

Long, Bryant and Sheriff Gilkeson went to Huffman's home and found him there. He was asked, "when did you

shave your mustache off?" and he answered, "last night," but later said, "this morning." His face disclosed that his mustache had been freshly shaven off and there remained upon the rest of his face "half a week's growth." The sheriff said to Huffman, "I am going to place you under arrest on suspicion" and before any one had told him of the shooting or that any crime had been committed and without asking why he was being arrested, he said, "that is all right, but you have the wrong man."

The officers having information that a lone bandit had robbed one J. D. Alexander, at Grottoes, a few miles away, on the night of April 25, 1936, went there and made an investigation before they went to Huffman's home. There they examined tire tracks made by the car used by the bandit and a sketch or drawing was made from three tire impressions which were found in the road.

The accused was then taken to Grottoes and then he undertook to account for his whereabouts from early in the evening prior to the shooting until 11 o'clock that night at which time he said he had gone home with his wife from Waynesboro where they attended a circus and that he did not leave again that night. He denied having been at Grottoes. He was then confronted with Alexander. The sheriff testified that the accused told him on this occasion that he (the accused) had a flat tire on the road from Waynesboro to his home that night and he had to change it. He then put his "knobby" tread tire on the left front wheel.

The automobile of the accused was taken by the officers when he was arrested. At that time the "knobby" tread tire was on the left front wheel. The sheriff, before the car was taken, found "knobby" tread tire tracks in the roadway at a small stream near the home of the accused.

The accused was taken to the jail in Staunton. He was then questioned about a gun and stated that his gun had been stolen several months before. He also said he did not go to Waynesboro in the Ford car on the night in question but that he had gone in his Chevrolet, but when the Chevrolet was examined it was discovered that both rear tires were off and

the differential had been taken out. This established conclusively that he did not go to Waynesboro in the Chevrolet.

The accused told the sheriff that when he returned from Waynesboro he and his wife went together through their part of the house, but later contradicted this statement and said they had gone through his mother's part of the house and had gotten food there.

Melvin T. Riddle, a son of Mr. W. H. Riddle, testified that he went to the scene of the shooting about 1:20 a. m. on the morning of April 26, 1936, and that the point where it occurred was some 500 or 600 yards east of his father's store and filling station. That he returned with Mr. Moses early in the morning after it was light and again looked over the ground and found, "where a car had come from the east to this cross road below my father's store, and the car headed into the cross road, into the intersection, turning to the left, and backed up into the intersection, out of the road and almost landed in a ditch, and pulled forward and backed up a second time and then pulled out again with a left hand turn and headed back east." The marks of the tires of the car were plainly visible on the ground and they indicated the exact point where a car had been parked. This point was some 50 yards from the intersection of the roads. This witness drew a diagram from the impression in the road showing the tread of the tires. From the impression and the diagram it was shown that the "knobby" tread tire was on the left front wheel. This witness and others compared the diagram of the tire treads with the tires on the car of the accused which was then in the custody of the officers at the jail and they corresponded. All four of the tires on the car had different treads.

When witness Bryant and the sheriff went to Grottoes from Riddle's filling station, Bryant located there tire tracks where a car had been parked. These tracks were not far from the filling station at Grottoes which was operated by Alexander. A sketch was made of these tracks and witness Bryant identified the tracks made by the car at Grottoes as having been made by the tire treads of the car of the accused.

The accused's car was a 1929 Ford roadster and over each

headlight there was a protruding visor. When these lights were turned on completely, both of them burned but when they were dimmed, the right headlight did not burn. Mervin Shull testified that while driving home with his brother just prior to the time that Mr. Riddle was shot they saw two men in front of the Riddle filling station. Farther on they passed a parked Ford roadster 1929 model with visors and parking lights on. About the time that they reached the home of Mr. Dutton, which was only a short distance, they heard the cries of Mr. Riddle. As Shull's brother got out to open the gate to turn into their home a car approached and Shull was under the impression that it was the same car he had seen parked as they passed a little farther up the road. He noticed that the headlights on the car that passed them had visors. Ralph Dutton, who was with Shull, testified that he noticed the parked roadster as they passed and that the left light was burning. After the car of the accused had been taken the lights were examined and it was found that when they were dimmed the right headlight did not burn. The sketches of the tire tracks were compared with tire tracks in the road going into and coming from the home of the accused and there appeared in the soft road the impression of a "knobby" tread tire on the left front wheel.

It was shown that the accused on the evening preceding the day of the homicide was driving a Ford roadster and that he stopped at the garage of H. F. Fultz at 7 o'clock. Mrs. Fultz was curious to know whether the accused had his wife with him at the time and watched him. She was not with him. The accused appeared at Alexander's store and filling station at Grottoes between 8:30 and 9:30 p. m., a few hours before the homicide, and Alexander was positive in his identification of him. He had a pistol that night which resembled the one which was found several days after the shooting. The accused went to Alexander's filling station on foot and at the time had an overcoat on. The overcoat of the accused was introduced in evidence and identified. When he left Alexander's store and after he had gotten into his car and started down the road, he drove several hundred yards before he turned his lights on. At 8 o'clock on the same night a Ford roadster

1929 model and being the same car which was seized at Huffman's home was seen parked about 75 yards below the store of Alexander. Around 12 o'clock of the same night and about one hour before the shooting the accused drove into the filling station of one Whitmore on the Hermitage road. Whitmore's son-in-law, Clarence Kerr, heard someone calling and he went down to the door, the top of which was made of glass and by the aid of a lamp he had an opportunity to see the face of the party who was asking for gasoline. This party gave his name as "Shiflett" and at the trial this witness identified the accused as being the man who came to Whitmore's filling station that night. Whitmore's filling station is two and seven tenths miles from the filling station of Mr. Riddle, and when the accused applied at Whitmore's station for gasoline he parked his car from 100 to 150 feet from this station. When the car was driven from the filling station the witness testified that he noticed a peculiar sound about the exhaust and after the car of the accused had been taken by the officers and he (the witness) had listened to its exhaust, it made the same noise as that heard by him from the exhaust of the car which left Whitmore's station just a very short time before the homicide.

The accused denied that he owned a pistol at the time of the crime, but it was clearly established that at the time Alexander was held up he had a pistol. Some several days later a pistol was found under a bridge not far from Riddle's filling station. Alexander said it looked like the one the accused had when he was at his filling station a few hours before Mr. Riddle was shot. It had four loaded shells in it and one empty shell. Three of the shells were copper jacket bullets. One of the bullets was of a different kind.

A bullet like the one found in the pistol was found at the home of the accused on the day of the shooting. It and one of those found in the gun had an identical peculiar mark, rendering them easily identified. At a point near the bridge over the stream where the pistol was found was a car track showing where an automobile had been parked in the soft dirt. This track corresponded with the tread of the right rear tire on the Huffman car.

On Friday after the homicide a pocketbook with Mr.

Riddle's card inside of it was found in a field near a fence on the east side of the road going towards Waynesboro.

The defense of the accused was that of an alibi and insanity. His mother gave testimony of an alibi but her testimony in this regard was thoroughly discredited by her conflicting statements.

The accused had been an inmate of the Western State Hospital, an institution for the insane, on two occasions. His mother testified that he had forged checks and that he was weak mentally. For that reason he was committed to the asylum. He remained there nine days and was furloughed. Later on, while he was still on furlough, the hospital record shows he was discharged as recovered. The hospital record also discloses that he was again committed because he attempted to kill his mother and father. He remained in the hospital nearly four months and was furloughed on April 7, 1932. Dr. DeJarnette, the superintendent of the hospital, testified that he examined the accused while he was in the hospital and that he showed no evidence of insanity. He also testified that the commitment papers for both commitments showed that he was charged with a crime in each instance when he entered the hospital.

Neither the accused nor his wife testified.

The jury viewed the 1929 Ford car of the accused. They saw the tread of the tires on the car and they had the sketches of the tracks that had been made from impressions near Riddle's filling station, near Alexander's station at Grottoes, near the bridge close to where the gun was found and in the roadway leading to the home of the accused.

The record in this case discloses a most aggravated murder. It discloses clearly that Riddle was enticed from his filling station early in the morning for the evident and obvious purpose of robbery and that he was robbed and murdered.

Most of the assignments of error challenge the ruling of the trial court on the admissibility of evidence. None of them question the law as laid down by the court in the instructions. With the exception of the proof of the identity of the accused, his counsel do not question the sufficiency of the evidence nor its conclusiveness as establishing his guilt.

■■■ In determining whether evidence is admissible, much must be left to the sound discretion of the trial court. Especially is this true where the evidence is circumstantial. Where the determination of facts depends upon circumstantial evidence, in no case is evidence to be excluded of facts or circumstances connected with the transaction from which an inference can be reasonably drawn as to the truth of the disputed fact.

In *Karnes v. Commonwealth*, 125 Va. 758, 99 S. E. 562, 564, 4 A. L. R. 1509, the court said: "The modern doctrine in this connection is extremely liberal in the admission of any circumstance which may throw light upon the matter being investigated, and while a single circumstance, standing alone, may appear to be entirely immaterial and irrelevant, it frequently happens that the combined force of many concurrent and related circumstances, each insufficient in itself, may lead a reasonable mind irresistibly to a conclusion."

■ Counsel for the accused challenged the admissibility of certain declarations made by Mr. Riddle after he had been taken to the hospital. Mr. Bryant, Mr. Gilkeson, the sheriff and the accused went to the hospital and the accused was taken into the presence of Mr. Riddle for the purpose of having Mr. Riddle identify him. Mr. Bryant, while testifying about this interview was asked, "what statement did Mr. Riddle make to you?" to which Bryant replied: "After looking at Huffman and the Sheriff started to take him out, he (Mr. Riddle) said he would like to hear him talk; and after the Sheriff took him (Huffman) out, he said: 'He is as near like him as could be'." That statement was not made in the presence of Huffman, and counsel for the accused moved to have it stricken out. The court overruled the motion and held that the witness could testify as to whether Mr. Riddle identified Huffman as the man who shot and robbed him. The ruling was excepted to. The witness then stated that from what Mr. Riddle said he (the witness) thought Mr. Riddle had identified Huffman. The court in its ruling was careful to strike out all testimony of the details of what took place at the hospital. Then when witness Bryant was cross-examined about the interview he was asked by counsel for

the accused: "Mr. Riddle told you, after this man had gone, that he looked like the man that he saw the night before?" to which the witness replied: "He said he looked as much like him as a person could." Thus, it is seen that this last statement was brought out by counsel for the accused and no motion was made to have it stricken out.

On re-direct examination by the attorney for the Commonwealth this question was asked the same witness: "About identifying the defendant here: Mr. Taylor has asked you several questions about whether or not Mr. Riddle identified him. I believe you have stated that he did identify him; that is, you so understood?" and he answered: "From what Mr. Riddle told me, I got the impression he had identified him." There was no objection by counsel for the accused to that question and answer.

If it was error to permit Bryant to testify on direct examination as to whether Mr. Riddle identified Huffman in the latter's absence, the accused is not in position to take advantage of it, for his counsel upon cross-examination of Mr. Bryant brought out the same fact by asking him if Mr. Riddle identified Huffman to which Bryant answered that he thought Huffman had been identified by Riddle. Again on re-direct examination of the same witness the attorney for the Commonwealth, without objection from counsel for accused, was permitted to bring out the same fact.

Under such circumstances, we conclude that it was not reversible error to admit the testimony of Bryant relating to the identification of the accused by Mr. Riddle.

Another point made by counsel for the accused is directed to the admissibility of certain declarations made by Mr. Riddle to Clyde Via and Samuel Diehl a short time after he had been wounded. Counsel urgently contend that these declarations were hearsay and inadmissible. The trial court held them to be a part of the *res gestae* and admitted them. The circumstances were these: Witness Diehl testified that he and Via reached Mr. Riddle a few minutes after he had been shot; that he was still crying out when they arrived; that they saw him lying near the ditch in the road and he had a flashlight in

his hand; that he saw the can sitting upright about 10 feet away and nearly full of gasoline. Witness Via testified that the first thing said when they reached him, Mr. Riddle exclaimed, "Oh why did I go out!" The witness was then permitted to relate the statements made by Mr. Riddle at that time. He testified that Mr. Riddle said the man who shot him was "rather heavy and short" and "he had a Charlie Chaplin mustache"; that he had asked for gasoline and said his name was Shiflett; that he got the gasoline for the man and poured it into a bucket; that the man said he would drive back and have his tank filled; that they were walking down the road and the man said "stick them up" and fired and that he was robbed of his pocketbook.

■ ■ Whether a statement is a part of the *res gestae* depends on the circumstances of each case, and there is no fixed rule by which it can be decided. Statements of the victim made a short time after he has been mortally wounded which obviously have not been concocted or premeditated charging the defendant with the act are a part of the *res gestae*.

■ Whether or not a statement is a part of the *res gestae* rests within the sound judicial discretion and judgment of the trial court. Such discretion and judgment, of course, may be the subject of review; but in doubtful cases there ought to be and is a presumption in favor of the action of the court below. See Digest of Virginia and West Virginia Reports (Michie), vol. 8, page 664, and cases cited.

In *Bowles v. Commonwealth*, 103 Va. 816, 48 S. E. 527, 530, this occurred: "Conductor White, examined as a witness on behalf of the Commonwealth, and who was the first person to reach the deceased after he received his injuries at the hands of the prisoner, and but a few minutes after the occurrence, having testified that he then and there asked the deceased what he had said to the prisoner, the deceased replied, 'I just asked him what he meant by it, and that is all the words I ever had with him.' "

It was held that: "No dying declaration was introduced or attempted to be introduced in evidence, and the statement which the deceased made to the witness White was admitted

in evidence as a part of the *res gestae*. It is needless to cite authority to show that the statement testified to by the witness White was properly admitted as a part of the *res gestae*, as it was so connected with the shooting of the deceased under investigation as to constitute a part of it."

We deem it unnecessary to further investigate the cases touching this subject. We think the declarations of Mr. Riddle made to witnesses Via and Diehl were properly admitted in evidence as a part of the *res gestae*. It is reasonably clear that they were not designedly made; that they were not fabricated; that Riddle, at the time they were made was still crying out in pain and agony from the mortal wound he had just received and that they formed a part of the occurrence or transaction which they characterized.

It was assigned as error that the court refused to strike paragraphs two and four from the bill of particulars. The record clearly shows that the court did strike out paragraph four.

Paragraph two notified the accused that he was charged with murder which was committed in connection with the robbery of the deceased. The point is made that inasmuch as the accused had been indicted separately for the robbery it ought not to have been set forth in the bill of particulars furnished in connection with the murder indictment. Generally speaking the point has merit, but when investigated in the light of the charge here, we think it of no moment. In this case the two offenses murder and robbery are so interrelated and interwoven that they cannot be investigated as entirely separate offenses. The Commonwealth should not have been prevented from showing all the details and circumstances of the murder, although some of the details tended to prove the robbery, and so when the accused called for a bill of particulars, all the circumstances surrounding the murder were properly furnished. It would have been impossible to have properly particularized the murder charge without referring to the charge of robbery.

As previously stated, Mrs. Huffman, the wife of the accused, did not testify. When witness Bryant was testifying

he was asked, "Where did you get the bullet at Mrs. Huffman's house?" He replied, "Mrs. Huffman turned it over to me." The answer was objected to on the ground that the testimony of any conversation the witness had with Mrs. Huffman would not be competent. The court overruled the objection and this ruling is challenged in one of the assignments.

We think there is no merit in this assignment. The witness did not attempt to relate any conversation that he might have had with the wife of the accused. The sole purpose of offering the bullet was to show that the accused had in his house a bullet exactly like the one found in the pistol which had been found and identified as belonging to him. As already stated, the bullet had a peculiar mark on it and an identical mark was on one of the bullets in the pistol.

The next point made by counsel is that when witness Long was testifying he said, "We went to where the car was parked of a man who *held him up.*" This had reference to Mr. Alexander being held up and counsel objected to the statement. The court sustained the objection and ruled the statement out. Counsel did not move for a mistrial on account of this improper evidence and the court could not have done more than it did. In addition to this, counsel for the accused in his cross-examination of the same witness brought out the fact that the officers went to Grottoes and talked to Mr. Alexander.

It is pointed out that the Commonwealth was permitted to develop the fact that Alexander had been robbed a few hours before Mr. Riddle was shot and it is contended that this was prejudicial error. The trial court had already ruled that the robbery of Mr. Alexander could not be shown in this case but that certain testimony of Mr. Alexander regarding the identity of the pistol and the overcoat of the accused was proper. Alexander was also permitted to identify the accused as the man he had seen that night and to state that he was in possession of the pistol which he (Alexander) testified was like the one found and which had been shown to belong to the accused. Alexander was asked what the accused got, and he replied, "Six dollars in money." Upon objection this

reply was stricken out and the jury were instructed to disregard it. No motion was made to declare a mistrial.

We have read the testimony of Mr. Alexander with great care and find that it was competent and properly admitted in evidence.

It was urged that the Commonwealth was permitted to inquire about a charge of forgery against the accused many years ago and that this was error, but upon adverting to the record it will clearly appear that this was introduced in the case by the mother of the accused when she testified in his behalf. The charge of forgery was also shown by the hospital record of the accused which was referred to and read from in the trial.

We find nothing in the remarks of the attorney for the Commonwealth that would justify this court in reversing the judgment.

The record shows clearly that the accused has had a fair trial according to the law of the land; that no prejudicial or reversible error appears in the record and that the verdict and judgment are supported by the evidence. The judgment is therefore affirmed.

The time fixed by the trial court in its judgment for the execution of the accused having passed, the judgment of this court is that the case be remanded to the trial court for the re-entry of the judgment setting another day for his execution.

*Affirmed.*