### 𝕽𝖎𝖈𝖍𝖒𝖔𝖓𝖉

CHARLES SYLVESTER STAMPER

V.

COMMONWEALTH OF VIRGINIA

August 30, 1979.

Record No. 790292.

Present: All the Justices.

*Edward D. Barnes (Denis C. Englisby; Nikas, Englisby & Barnes,* on brief), for appellant.

*James E. Kulp, Deputy Attorney General (Marshall Coleman, Attorney General; Thomas D. Bagwell, Assistant Attorney General,* on brief), for appellee.

COCHRAN, J., delivered the opinion of the Court.

Under the procedure required by Code §§ 19.2-264.3 and -264.4, Charles Sylvester Stamper was convicted on November 17, 1978, of three capital murders during the commission of armed robbery in violation of Code § 18.2-31(d).[1] The jury fixed his punishment for

---

[1] *Code § 18.2-31. Capital murder defined; punishment.* The following offenses shall constitute capital murder, punishable as a Class 1 felony:

\* \* \*

(d) The willful, deliberate and premeditated killing of any person in the commission of robbery while armed with a deadly weapon;

\* \* \*

each offense at death, as authorized by Code § 18.2-10(a), and the trial court, after receiving the report of the probation officer, required by Code § 19.2-264.5, entered judgment on February 9, 1979, upon the jury verdicts.

The evidence adduced against Stamper was entirely circumstantial. On Saturday, March 25, 1978, Richard Wrenn, who worked as a breakfast cook at Shoney's Restaurant in Henrico County on Saturdays and Sundays, came to work at approximately 6:35 a.m. He found that the glass in the lower part of the front door had been shattered and glass was scattered on the sidewalk outside the door. Wrenn crawled through the door and discovered the bodies of Steven Staples, the morning manager, and Agnes Hicks, the morning waitress, both of whom had been shot and killed. He noticed that the office safe was open and that it contained change but no currency. Wrenn notified the police and called an ambulance. Other evidence disclosed that Franklin D. Cooley, the janitor, also had been found shot; he had been removed to a hospital where he died several hours later without regaining consciousness.

The evidence established that Staples's death resulted from a wound to the upper chest inflicted by a .22 caliber copper-colored coated bullet. The bullet made a downward path from its point of entry above the collarbone. Powder burns indicated that the weapon had been fired within inches of the victim. Staples's skull had been fractured by a heavy instrument approximately ⅜-inch in width, and there were multiple lacerations on his head and a cutting-type mark on his neck. A piece of angle iron was lying on the floor near Staples's body. A trail of smeared blood extended from the office safe to the place where Staples's body was found. Cooley also died from a .22 caliber copper-colored coated bullet fired into his head from a distance of a few inches. Mrs. Hicks was struck in the head by two bullets, one copper-colored coated and the other plain lead, fired from a greater distance. Staples and Mrs. Hicks died at approximately 6:00 a.m.

On the day of the crimes the night manager closed the restaurant at 12:30 a.m. He left at 1:00 a.m. after ascertaining that the safe was locked and the place was secure. He estimated that the safe then contained approximately $4,500 in cash. Cooley was inside the restaurant at that time, but he had no key to the building. Cooley's only means of exit, prior to the arrival of Staples, who had a key, was through a fire exit, but this door, when opened, sounded an alarm which could be turned off only with a key.

A friend drove Mrs. Hicks to work at approximately 5:30 a.m. He saw Staples and another man, whom he did not recognize, inside the

restaurant. Staples opened the front door and admitted Mrs. Hicks.

A witness observed a "yellow-green" car parked near Shoney's between 5:40 and 5:50 a.m. on the day of the crimes. At approximately 5:50 a.m. another witness drove past a parking lot used by Shoney's employees and saw a yellow car leaving the lot.

Uncontradicted evidence revealed that Shoney's did not open for business until 7:00 a.m., that only employees were permitted to enter the building prior to opening, that Staples, and possibly Mrs. Hicks, had a key to the door, that the locks and combination to the safe had recently been changed and Staples was the only one of the three employees who knew the combination, and that employees knew that opening the fire exit would set off an alarm. When the police arrived to investigate they found that all doors were intact except the shattered front door. An inventory revealed that $3,983.77 in cash was missing from the safe, and that $350.15 in coins and loose change remained.

From the evidence that the front door had been broken from the inside the police deduced that the crimes had been committed by one or more persons, familiar with the interior arrangement of the restaurant and the operating routine of the business, who had been permitted to enter before the time of opening. Stamper had been employed as a breakfast cook at Shoney's for two months, working from 6:30 a.m. to 2:00 p.m. Mondays through Fridays, but working on Saturdays only if another cook did not report. Prior to March 25 he had given notice of his intention to quit because of his wife's pregnancy and his need for more money. Although Stamper was scheduled to work on Monday and Tuesday after the Saturday on which the crimes were committed, he did not report until Wednesday. He then worked for a week or longer before terminating his employment.

On the day of the offenses, the investigating officers began to interview Shoney's employees and former employees. That evening they stopped Stamper shortly after he had driven from his parents' home in his wife's yellow Ford Torino automobile in which his wife and a friend were passengers. At the request of the officers, Stamper and his wife, accompanied by an officer, proceeded to police headquarters for questioning. When asked by the police if they could search the car, Stamper conversed by telephone with his father, after which he and his wife signed a written consent to the search. Stamper informed the police that the automobile had been under his control throughout the day.

Glass particles were seized from the floorboard of the car on the driver's side. Seven of the 36 particles seized were found, upon analy-

sis, to "match, in optical properties" glass from the broken front door at Shoney's. The expert witness could not say that the glass particles found in the car came from Shoney's, but he found the number of matching fragments to be "significant".

On either Monday or Tuesday after the crimes, Stamper visited a used car lot and tried out a 1972 Lincoln automobile, offered for sale at $3,500, which he expressed an interest in purchasing. Stamper told the manager that he had a $1,500 down payment in his pocket and would finance the balance. The manager gave Stamper loan application forms to complete at home, but Stamper never returned.

At the time of the offenses, Stamper was in financial difficulty. He was delinquent in payment of rent for his apartment, and he had been served with a notice to pay or vacate the premises. On March 30, he paid the rent and late charges by money order.

Stamper was also delinquent, as of March 8, in payments on his account at a jewelry store, and the merchant obtained a judgment against him in the sum of $63.55, plus court costs of $5.50. On April 5, Stamper paid the sum of $63.55. On April 8, he paid the balance of $5.50, bought a watch from the same merchant for $180, on which he made a down payment of $100, and guaranteed payment by a friend of $355, the balance of the purchase price for a ring after the friend had made a down payment of $50. No further payments were made on either the watch or the ring.

On May 13, a set of keys belonging to Staples was found in the woods near the home of Stamper's parents. These keys fit the 1969 Ford automobile which Staples had borrowed from his brother and driven to work at Shoney's on the day of his death.

On October 16, a .22 caliber revolver was found covered with dirt in the same wooded area where the keys had been discovered. There were two Winchester Western and two Remington unfired cartridges, one empty chamber, and four empty cartridge casings in the revolver. According to the expert testimony of Cecil Moorhead, a forensic scientist in the field of firearms identification, the sequence of firing the cartridges had been: Winchester Western, Winchester Western, Remington, and Winchester Western. It was "most likely", in his opinion, that the first two bullets fired were copper-colored coated; he found that the bullets removed from the bodies of Staples and Cooley were copper-colored coated. The fragments of lead bullet removed from the body of Mrs. Hicks could have been fired from the Remington cartridge case, and the copper-colored coated bullet fragment also removed from Mrs. Hicks could have been fired from the other Winchester Western cartridge case.

By test firing the revolver, Moorhead determined that the general characteristics of the test bullet and the bullets removed from the bodies of the victims were similar, and that the width of the lands and grooves and the direction of rotation of the bullets were the same. However, the bore of the revolver was pitted with rust, and this condition precluded Moohead from making a positive identification of the revolver as the murder weapon.

At the conclusion of the Commonwealth's evidence, Stamper's motion to strike the evidence was overruled. The only evidence adduced by Stamper was the testimony of his wife, Darlene, who testified that she was 7½ months pregnant at the time of the crimes; that she was at home asleep in bed between 5:00 and 6:00 a.m. on that day; that her husband was there in the same bed; that she awakened between 6:30 a.m. and 7:00 a.m. that morning; and that they had breakfast together.

At the conclusion of all the evidence, Stamper again moved to strike the Commonwealth's evidence, and the motion was overruled. After the jury had returned its verdicts, Stamper's motion to set aside the verdicts was denied, and the penalty phase of the proceeding was conducted. In addition to placing in evidence Stamper's criminal record, which showed that he had been convicted of armed robbery, the Commonwealth presented as a witness, over Stamper's objection, the victim of the armed robbery.

In 41 assignments of error, many of which were not pursued on brief or in argument, Stamper has challenged his convictions and his sentences.

## I. Pretrial Proceedings.

### A. Motion to Dismiss Capital Murder Indictment on Constitutional Grounds.

■ Stamper's challenge to the constitutionality of the Virginia capital murder statute on the grounds that the death penalty under the statute constitutes cruel and unusual punishment and denies him due process and equal protection is supported only by arguments that have been considered and rejected by us in *Waye* v. *Commonwealth,* 219 Va. 683, 251 S.E.2d 202, *cert. denied,* 442 U.S. 924 (1979), and *Smith* v. *Commonwealth,* 219 Va. 455, 248 S.E.2d 135 (1978), *cert. denied,* 442 U.S. 932 (1979). We reaffirm our views expressed in those cases.

B. Motion to Require Commonwealth to Provide Defense With Records of Criminal Convictions of Jurors.

■ The trial court overruled Stamper's motion to require the Commonwealth to provide him with records of convictions of prospective jurors and stated that ample opportunity would be given defense counsel to obtain the information on *voir dire*. Stamper objected and assigned error to the court's ruling, but he has neither briefed nor argued the issue. The Commonwealth had offered to supply defense counsel whatever information it had concerning convictions of prospective jurors. Stamper was not entitled to require the Commonwealth to furnish information which it never acquired, and we hold that the trial court properly overruled the motion.

C. Motion to Suppress Evidence.

■ Stamper argues that the trial court erred in denying his motion to suppress the evidence as to the glass fragments which were seized from his wife's automobile on the evening of the day on which the crimes were committed. He admits that he and his wife executed a consent form to permit the search and seizure, but he asserts that their signatures were obtained by coercion.

The question of the voluntariness of a consent is one of fact to be determined by the trial court. *Lowe* v. *Commonwealth,* 218 Va. 670, 678, 239 S.E.2d 112, 117 (1977), *cert. denied,* 435 U.S. 930 (1978). The trial court in the present case, after a full evidentiary hearing on the motion to suppress, found that the Commonwealth had carried its required burden of proving that consent was freely given. This decision of the trial court must be accepted on appeal unless clearly erroneous. See *United States* v. *Vickers,* 387 F.2d 703, 706 (4th Cir. 1967), *cert. denied,* 392 U.S. 912 (1968).

There is ample evidence to support the trial court's ruling that the consent of Stamper and his wife was voluntarily given. An officer testified that Stamper was told that he was free to leave the police station but that the police wanted to search the car, and that an affidavit for a search warrant was being prepared for that purpose. There is evidence that Stamper telephoned his father and then invited the officers to make the search, and that both Stamper and his wife were informed of their right to refuse consent before they signed the consent form. We hold that the trial court did not err in overruling the motion to suppress.

D. Motion for a Continuance.

■ The trial court, on the motion of the Commonwealth granted a continuance, over Stamper's objection, on October 17, 1978. This ruling was made the day after the .22 caliber revolver had been found near the home of Stamper's parents, and enabled the Commonwealth to have certain tests conducted which might have benefited either the' Commonwealth or Stamper, depending upon the results of the tests. There was no abuse of discretion by the trial court in granting the continuance.

E. Exclusion of Jurors.

■ Stamper's contention that the trial court erred in striking for cause certain jurors because of their beliefs concerning capital punishment is without merit. On *voir dire* a juror stated unequivocally that under no circumstances could he vote for a death sentence; when two other jurors concurred in this statement, all three were excluded for cause. The statement constituted an irrevocable commitment to vote against the death penalty, which we have held to be prerequisite to exclusion of a juror under the doctrine of *Witherspoon* v. *Illinois,* 391 U.S. 510, 522 (1968). *Coppola* v. *Commonwealth,* 220 Va. 243, 250, 257 S.E.2d 797, 802 (1979) (this day decided); *Smith* v. *Commonwealth, supra,* 219 Va. at 464, 248 S.E.2d at 141; *Lewis* v. *Commonwealth,* 218 Va. 31, 35, 235 S.E.2d 320, 323 (1977). The ruling of the trial court on this question of fact will not be disturbed.

## II. The Guilt Trial.

A. Admissibility Into Evidence of Glass Particles, Keys, and Revolver.

■ Stamper's objection to the admissibility into evidence of the glass particles seized on the floor of his wife's car, and the keys and the revolver found near his parents' residence is untenable. The case against Stamper was based entirely upon circumstantial evidence, and any such evidence tending to prove guilt was admissible for whatever weight the jury saw fit to accord it.

For many years, we have approved the principle that every fact, however remote or insignificant, that tends to establish a probability or improbability of a fact in issue is admissible. *Hardy's Case,* 110 Va. 910, 922, 67 S.E. 522, 527 (1910); *Karnes* v. *Commonwealth,* 125 Va. 758, 764, 99 S.E. 562, 564 (1919); *Hines* v. *Commonwealth,* 136 Va. 728, 749-50, 117 S.E. 843, 849 (1923).

In *Huffman* v. *Commonwealth,* 168 Va. 668, 190 S.E. 265 (1937), we said:

> In determining whether evidence is admissible, much must be left to the sound discretion of the trial court. Especially is this true where the evidence is circumstantial. Where the determination of facts depends upon circumstantial evidence, in no case is evidence to be excluded of facts or circumstances connected with the transaction from which an inference can be reasonably drawn as to the truth of the disputed fact.

*Id.* at 679, 190 S.E. at 270.

The challenged evidence was, of course, prejudicial, but it was relevant, it tended to connect Stamper with the crimes, and it was admissible.

### B. Admissibility Into Evidence of Videotape and Sound Recording and Photographs.

■ Stamper maintains that the court erred in admitting into evidence photographs of the victims and a videotape in black and white with sound recording which described the scene inside Shoney's restaurant on the morning of March 25. In Stamper's view, since he stipulated that the victims were dead and did not object to the diagram introduced by the Commonwealth to show where the bodies were found, the videotape was not needed to establish any necessary fact but was introduced to inflame and prejudice the jury. He argues that any probative value of this evidence was far outweighed by its prejudicial and inflammatory effect.

The admissibility of photographic evidence rests within the sound discretion of the trial court. *Waye* v. *Commonwealth, supra,* 219 Va. at 692, 251 S.E.2d at 208; *Smith* v. *Commonwealth, supra,* 219 Va. at 467, 248 S.E.2d at 143. "There is no abuse of discretion in admitting photographs which are 'relevant and material to establish premeditation and malice and to show the degree of atrociousness of the crime.'" *Id.,* citing *Brown* v. *Commonwealth,* 212 Va. 515, 519, 184 S.E.2d 786, 789 (1971), *vacated on other grounds,* 408 U.S. 940 (1972). *See Evans* v. *Commonwealth,* 215 Va. 609, 614, 212 S.E.2d 268, 272 (1975).

We believe that it is also within the discretion of the trial court to determine the admissibility of videotape films. In other jurisdictions, it has been held that such films, if relating to otherwise competent evidence, are generally admissible in criminal trials. *See People* v. *Mines,*

132 Ill. App.2d 628, 270 N.E.2d 265 (1971); *State* v. *Johnson,* 18 N.C. App. 606, 197 S.E.2d 592 (1973); *Williams* v. *State,* 461 S.W.2d 614 (Tex. Crim. App. 1970); Annot., 60 A.L.R.3d 333 (1974). Ordinarily, the admissibility of videotape films is governed by the same rules which apply to the admission of photographs or motion pictures. *See State* v. *Lusk,* 452 S.W.2d 219 (Mo. 1970); *Paramore* v. *State,* 229 So.2d 855 (Fla. 1969), *vacated on other grounds,* 408 U.S. 935 (1972); *People* v. *Heading,* 39 Mich. App. 126, 197 N.W.2d 325 (1972).

We have viewed the photographs introduced into evidence and have seen the videotape and heard the sound recording which described the interior of the restaurant after the police arrived. The photographs and videotape portrayed a scene of otherwise indescribable violence. The sound recording with the videotape was a factual narration by an investigating officer of the interior arrangement of the restaurant and the relative positions of the bodies of Staples and Mrs. Hicks. This evidence tended to support the Commonwealth's theory that the killer's motive was robbery, that he was familiar with the interior of the restaurant, and with the operating routine of the business, that he and the victims knew one another, and that he acted with brutal ferocity. The Commonwealth was not precluded from offering such evidence by Stamper's willingness to stipulate certain facts. *Inge* v. *Commonwealth,* 217 Va. 360, 364, 228 S.E.2d 563, 566 (1976). We hold that the trial court, which could reasonably conclude that the probative value of the evidence outweighed its prejudicial effect, did not abuse its discretion in ruling that the photographs, videotape and sound recording were admissible.

## C. Admissibility of Other Evidence.

■ We further hold that there was no abuse of discretion by the trial court in admitting into evidence testimony that a car similar in color to Stamper's wife's car had been seen near the scene at the approximate time of the crimes, testimony as to the operating routine at Shoney's restaurant, and testimony of the used car dealer about Stamper's expressed desire to purchase an automobile. This evidence tended to prove guilt, and the trial court did not err in ruling that it was admissible. Its probative value outweighed its prejudicial effect. *Cf. Olsen* v. *Commonwealth,* 212 Va. 545, 546, 186 S.E.2d 51, 52 (1972), quoting *Bunting* v. *Commonwealth,* 208 Va. 309, 314, 157 S.E.2d 204, 208 (1967).

### D. Sufficiency of the Evidence.

■ It is Stamper's principal contention that the evidence is insufficient to prove his guilt beyond a reasonable doubt. Indeed, he argues that the evidence not only fails to connect him with the crimes but fails to establish that there was a robbery.

It is true, of course, that the evidence, viewed in the light most favorable to the Commonwealth, must go further than to create a mere suspicion or probability of guilt; it must exclude every reasonable hypothesis except that of guilt; it must establish guilt beyond a reasonable doubt. *Cameron* v. *Commonwealth,* 211 Va. 108, 110, 175 S.E.2d 275, 276 (1970). But the Commonwealth is not required to carry its burden of proof by direct evidence. Circumstantial evidence is as competent and is entitled to as much weight as direct evidence, provided it is sufficiently convincing. *Turner* v. *Commonwealth,* 218 Va. 141, 145-46, 235 S.E.2d 357, 360 (1977). Indeed, in some cases circumstantial evidence may be the only type of evidence which can possibly be produced. *Toler* v. *Commonwealth,* 188 Va. 774, 780, 51 S.E.2d 210, 213 (1949).

In the present case, the evidence strongly suggested that the crimes were committed by a Shoney's employee. Only employees were admitted to the restaurant before the opening time of 7:00 a.m. It is a reasonable inference that the culprit persuaded or forced Staples to open the safe; Staples was the only one of the victims who knew the safe combination. The murderer evidently made his escape by breaking out the glass in the front door rather than by making an apparently easier exit through the side fire door; only employees knew that the fire door was connected to an alarm which was automatically triggered when the door was opened. All three employees who were in the restaurant were murdered, even though Staples apparently cooperated by opening the safe, which raises an inference that the perpetrator of the crimes was known by the employees, whom he killed to eliminate identifying witnesses to the robbery. Stamper was employed as a weekday breakfast cook at Shoney's.

It is a reasonable inference that the automobile seen near Shoney's at the approximate time of the crimes was the yellow Ford Torino owned by Stamper's wife. Stamper was stopped by the police on the evening of March 25 while operating this car. He admitted that he and no one else had driven the vehicle that day. Seven of the glass particles seized from the floorboard on the driver's side of the Torino had the same refractive index as glass from the Shoney's door, a significant fact in the opinion of the expert witness. It is a reasonable

inference that glass particles broken from Shoney's door adhered to the feet or clothing of Stamper and were dislodged by his movements in operating the Torino.

Staples's car keys and a .22 caliber revolver were found within a few hundred yards of the residence of Stamper's parents. Stamper had been seen at his parents' home on the evening of March 25. There was evidence that prior to marrying and moving to an apartment about one year and three months prior to the date of the crimes Stamper had made his home with his parents. It is a reasonable inference that he was thoroughly familiar with the wooded area where the keys and revolver were found.

The .22 caliber revolver contained four expended cartridges and four unfired cartridges. In the opinion of the firearms expert, three of the expended cartridges in all likelihood originally contained copper-colored coated bullets, and one contained a plain lead bullet. Of the four .22 caliber bullets recovered from the bodies of the victims, three were copper-colored coated and one was plain lead. A test bullet fired from the revolver exhibited the same general characteristics as the bullets recovered from the victims. It is a reasonable inference that the .22 caliber revolver was the murder weapon, and that it was hidden by Stamper in the wooded area.

Finally, the evidence showed that during March, 1978, Stamper was in arrears on his rent and on an account with a jewelry store, and that he had given notice on March 20 that he was quitting his job at Shoney's because he needed more money. Within a few days after the crimes, Stamper appeared to have no financial worries. He informed a used car dealer that he had in his pocket $1,500 to use for a down payment on a $3,500 automobile. He paid his past-due rent, settled his delinquent account at the jewelry store, made a $100 cash down payment on account of the purchase price of a new watch, a larger single payment than he had ever before made at that store, and guaranteed a friend's payment for a diamond ring. It is a reasonable inference that Stamper had suddenly acquired considerable money.

We hold that the evidence, considered as a whole, is sufficient to support the jury's findings that Stamper perpetrated the three murders. While no single piece of evidence may be sufficient, the "combined force of many concurrent and related circumstances, each insufficient in itself, may lead a reasonable mind irresistibly to a conclusion." *Karnes* v. *Commonwealth, supra,* 125 Va. at 764, 99 S.E. at 564. The jury could have properly concluded that the circumstances proved beyond a reasonable doubt that Stamper killed the victims by shooting them with the .22 caliber revolver which he then hid in the wooded

area near his parents' home.

■ There is no merit in Stamper's argument that the evidence is insufficient to prove, as an essential element of capital murder, that a robbery occurred. Robbery, a common-law crime in Virginia, is defined as "the taking, with intent to steal, of the personal property of another, from his person or in his presence, against his will, by violence or intimidation." *Jones* v. *Commonwealth,* 218 Va. 18, 21, 235 S.E.2d 313, 315 (1977). The violence or intimidation that is an essential ingredient of robbery must precede or be concomitant with the taking, *Mason* v. *Commonwealth,* 200 Va. 253, 255-56, 105 S.E.2d 149, 151 (1958); Stamper says that there is no evidence to establish this prerequisite. We disagree.

The evidence shows that the safe contained approximately $4,500 when Shoney's closed about midnight, and that the safe was observed to be locked at 1:00 a.m. on March 25. At 6:35 a.m. on that morning the safe was found open and approximately $3,984 was missing. There was blood on the safe and the surrounding cabinets; a trail of blood led from the safe to the body of Staples, the employee in charge. Staples was found dead, with multiple lacerations, a skull fracture, a cut on his neck, and a gunshot wound in the chest. It is a reasonable inference that Staples either opened the safe under duress and intimidation or was duped into opening it, and was then beaten, cut, and shot as he attempted to prevent the consummation of the robbery. It is also a reasonable inference that Mrs. Hicks and Cooley were shot as the robber sought to escape with the loot and to avoid subsequent identification by eyewitnesses. The evidence that the murders occurred during the commission of a robbery is overwhelming.

### E. Instructions.

Although Stamper did not pursue on brief or in oral argument his challenge to the refusal by the trial court to grant certain proffered instructions, two of his assignments of error related to these rulings. The proffered instructions were either unsupported by the evidence or were repetitious of other granted instructions which adequately stated the applicable law.

### F. Question Interposed by a Juror.

■ At the conclusion of the evidence, after both sides had rested, a juror asked certain questions, including one concerning a "possible accomplice". Stamper's counsel objected when the trial judge suggested, out of the presence of the jury, that he tell the jury that similar

charges were pending against another individual. Several variations of language were then discussed, and the trial judge ruled that he would advise the jury that whether more than one person was "involved" was irrelevant, that the issue was whether Stamper "was involved". Stamper's counsel conceded that this wording was "better", and the jury was informed in that manner.

Stamper now says that this answer to the juror's inquiry improperly permitted the jury to find him guilty of capital murder without proof that he fired the fatal shots. *See Johnson* v. *Commonwealth,* 220 Va. 146, 255 S.E.2d 525, (1979). The objection on this ground, not asserted in the trial court, comes too late. Rule 5:21. Moreover, there is no merit to the objection. The instructions adequately informed the jury that they must find that Stamper killed the victims to convict him of the capital murders.

### III. The Sentence Proceeding.

#### A. Testimony by the Victim of Another Crime.

■ At the sentence proceeding which promptly followed the determination of Stamper's guilt, the Commonwealth, over Stamper's objection, adduced the testimony of Deanie Ellsworth. This witness testified that on August 5, 1971, while employed at a Richmond gasoline service station, he put gasoline in Stamper's car, and that when he approached the driver to collect the purchase price he was shot in the head. Part of the bullet had never been removed from Ellsworth's head; the injury had permanently impaired his walk, speech, hearing and sight, so that he was unable to work. Stamper argues that the probative value of Ellsworth's testimony was outweighed by its prejudicial effect and that the testimony was presented primarily to inflame the passion of the jury. We disagree.

The statute requires that the jury be fully informed before it determines the appropriate punishment in a capital murder case. The burden is upon the Commonwealth to prove beyond a reasonable doubt that the death penalty should be imposed.[2] The jury has the

---

[2] Code § 19.2-264.4C provides:

"The penalty of death shall not be imposed unless the Commonwealth shall prove beyond a reasonable doubt that there is a probability based upon evidence of the prior history of the defendant or of the circumstances surrounding the commission of the offense of which he is accused that he would commit criminal acts of violence that would constitute a continuing serious threat to society, or that his conduct in committing the offense was outrageously or wantonly vile, horrible or inhuman, in that it involved torture, depravity of mind or aggravated battery to the victim."

duty to consider all the evidence relevant to sentencing,[3] both favorable[4] and unfavorable, before determining whether the defendant has such a propensity to violence as to make him a menace to society, or whether the crime of which he has been convicted is so atrocious that he should be executed. In determining his proclivity for violence, the jury may obtain from the mere record of previous convictions an inaccurate or incomplete impression of the defendant's temperament and disposition. Armed robbery is a crime of violence, but the violence, in nature and extent, which is manifested by the defendant may differ significantly from that exhibited by others convicted of a similar crime or, indeed, by others convicted of the identical crime.

In *People* v. *Durham,* 70 Cal.2d 171, 74 Cal. Rptr. 262, 449 P.2d 198 (1969), *cert. denied,* 406 U.S. 971 (1972), the defendant claimed that the trial court erred in allowing the victim of a prior sodomy offense committed by the defendant to testify to the details of that crime during the penalty phase of the defendant's trial for murder. The victim, who was seven years old at the time the sodomy offense occurred, testified in vivid detail as to the facts. Upon review, the Supreme Court of California concluded that the probative value of the evidence was sufficient to outweigh its clear prejudicial effect, and the trial court did not err in admitting it. *Id.* at 186, 74 Cal. Rptr. at 277, 449 P.2d at 215. The Court held that the evidence was properly admitted as relating to the defendant's background and history. And, in *People* v. *Purvis,* 52 Cal.2d 871, 346 P.2d 22 (1959), the Court found no error in the trial court's action in permitting witnesses to testify during the penalty phase of the defendant's murder trial about a prior murder committed by the defendant. The Court rejected the contention that the best evidence of the circumstances of the former killing was the transcript of the testimony at the former trial, holding

---

[3] Code § 19.2-264.2 provides:

"In assessing the penalty of any person convicted of an offense for which the death penalty may be imposed, a sentence of death shall not be imposed unless the court or jury shall (1) after consideration of the past criminal record of convictions of the defendant, find that there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing serious threat to society or that his conduct in committing the offense for which he stands charged was outrageously or wantonly vile, horrible or inhuman in that it involved torture, depravity of mind or an aggravated battery to the victim; and (2) recommend that the penalty of death be imposed."

[4] Code § 19.2-264.4B provides in part:

"Evidence which may be admissible ... may include the circumstances surrounding the offense, the history and background of the defendant, and any other facts in mitigation of the offense. ..."

that "the testimony of witnesses who are available is preferred to the record of their testimony given at another time". *Id.* at 52 Cal.2d 882, 346 P.2d at 28.

In the present case, we hold that the trial court did not err in admitting Ellsworth's testimony. It was relevant to a consideration of Stamper's history and background and to a determination by the jury whether there was a probability that he would "constitute a continuing serious threat to society". Thus, the probative value of the evidence was sufficient to outweigh its prejudicial effect.

### B. Other Incidents of the Proceeding.

#### 1. Evidence as to Stamper's record of previous convictions.

 Leslie G. Wright, Supervisor of Records of the Virginia Department of Corrections, related Stamper's penal history. Stamper was sentenced in 1972 to serve 20 years for the 1971 armed robbery. He was also sentenced in 1972 to serve 12 months in jail for unauthorized use of a motor vehicle, and in 1974 was sentenced to six months in jail as an accessory after the fact to an escape from the penal system. He was released on parole in 1976.

When Wright testified that Stamper had been convicted within the penal system of certain offenses, including stealing from the kitchen and committing a homosexual act, Stamper's counsel objected, moved that this evidence be stricken and, after ascertaining from Wright that the convictions had not been obtained in a court of record, moved for a mistrial. The trial court promptly sustained the objection when interposed, and directed the jury to disregard any evidence about Stamper's stealing or homosexual activity in the penal system. The motion for a mistrial was denied, but the trial court again admonished the jury to disregard any evidence as to Stamper's conduct within the penitentiary system. Although the trial court's action in denying the motion for a mistrial is the subject of an assignment of error, the issue has been neither briefed nor argued.

If evidence as to acts committed by Stamper in prison was inadmissible, which we do not here decide, the trial court's prompt corrective action was sufficient to eliminate any prejudicial effect. *Lewis* v. *Commonwealth*, 211 Va. 80, 83, 175 S.E.2d 236, 238 (1970). We hold that the trial court did not abuse its discretion in denying Stamper's motion for a mistrial.

#### 2. Instructions to the Jury.

 In two assignments of error, neither briefed nor argued, Stamper asserted that the trial court erred in refusing to instruct the

jury in respect to parole and in permitting the question of the death penalty to go to the jury.

The trial court gave to the jury a single instruction embodying the two alternative punishments, death or life imprisonment, authorized by the statutory language of Code § 19.2-264.2. There was evidence from which the jury could find that there was a probability that Stamper would commit criminal acts of violence that would make him a continuing menace to society. There was also evidence from which the jury could find that his conduct in committing the murders was outrageously or wantonly vile, horrible or inhuman in that it involved torture, depravity of mind or aggravated battery beyond that necessary to accomplish an act of murder, as defined in *Smith* v. *Commonwealth, supra,* 219 Va. at 478, 248 S.E.2d at 149. There was evidence that Staples had been beaten and cut before he was killed, that he and Cooley were shot from a distance of a few inches, that Mrs. Hicks was shot twice, and that Stamper was a fellow employee of the three victims.

After the case had been argued and the jury had retired, the jury returned to the courtroom to ask whether, if life imprisonment were imposed, Stamper would be eligible for parole, and, if so, after what period of time. The trial court, relying upon *Hinton* v. *Commonwealth,* 219 Va. 492, 247 S.E.2d 704 (1978), informed the jurors that it was their duty to fix the punishment and what might happen afterwards was of no concern to them. This action of the court was correct and proper under *Hinton,* and there is no merit in the assignment of error.

### 3. The Verdicts of the Jury.

 In another assignment of error, neither briefed nor argued, Stamper stated that the verdicts upon the capital murder indictments were unsupported by the evidence and were inconsistent in assigning different reasons for fixing his punishment at death. The verdict in the Staples capital murder was based upon both alternatives, the probability that Stamper would be a continuing threat to society, and his outrageously or wantonly vile, horrible or inhuman conduct in committing the offense. The verdicts in the other capital murder cases were grounded solely upon the first alternative. All three verdicts were amply supported by the evidence, and the difference in the findings was justified. The jury obviously found aggravation in the killing of Staples but not in the other two murders. Indeed, there was no evidence that Cooley or Mrs. Hicks had been beaten or cut as had Staples.

### 4. The Presentence Report.

 Under Code § 19.2-264.5 the trial court was required, before imposing the death sentence fixed by a jury verdict, to direct a probation officer to report upon the history of the defendant and other relevant facts. Stamper maintains that he was denied the benefit of a thorough presentence report, and thereby denied due process and equal protection of the law, because the officer who prepared his report used information from a prior 1972 presentence report and failed to interview Stamper's parents or his wife. We do not agree.

Code § 19.2-264.5 provides only that a thorough investigation be conducted; it does not specify that any particular procedure be used in compiling the report or that any particular information be included therein. Decisions concerning such matters must by necessity be left largely to the discretion of the trial court and the individual probation officer.

The record reveals that John Bonanno, the probation officer who prepared Stamper's report, used information from a 1972 presentence report, but only after the accuracy of this information was confirmed in an interview with Stamper. Bonanno, who testified at the sentencing hearing, noted that Stamper was incarcerated from 1972 through 1976 and was on parole from 1976 until the time of his arrest in the present case. Bonanno obtained from Stamper's parole officer information concerning Stamper's activities from the time of his release from prison in 1976 until the time of his subsequent arrest. Given the 1972 report, his interview with Stamper and the information supplied by the parole officer, Bonanno did not feel that it was necessary to interview Stamper's relatives.

Both Stamper's wife and his parents testified before the jury at the sentencing hearing. Moreover, Stamper was given the opportunity to cross-examine Bonanno thoroughly on the report and to introduce relevant evidence on his own behalf to supplement or contradict the report. Under these circumstances, we cannot say that the court erred in admitting the report into evidence or that Stamper was denied any rights under § 19.2-264.5.

### 5. The Kearnard Tyrone Bowling Record.

 Reference was made in the presentence report to the conviction of Kearnard Tyrone Bowling for the murder of Mrs. Hicks. The trial court announced that on its own motion the transcript of Bowling's trial, over which another judge had presided, either would be made a part of the Stamper record or would be incorporated by

reference if Bowling appealed his conviction to our Court, and this alternative provision was included in the final judgment order. We find no objection interposed by Stamper to this ruling of the trial court and the assignment of error thereto, which has been neither briefed nor argued, comes too late. Rule 5:21.

### 6. Allocution.

█ Stamper contends that the trial court violated Code § 19.2-298[5] by failing to inquire whether he had any statement to make prior to his sentencing.

It is true that the transcript fails to show that the right of allocution was extended to Stamper personally by the trial court, although it appears that opportunity was afforded him to speak if he so desired. However, the final judgment order entered by the trial court on February 9, 1979, contains this language:

\* \* \*

Whereupon, the Court taking into consideration all of the evidence in the cases, the report of the Probation Officer, the matters brought out on cross-examination of the Probation Officer and such additional facts as were presented by the defendant, *and it being demanded of the defendant if anything for himself he had or knew to say why judgment should not be pronounced against him according to law, and nothing being offered or alleged in delay of judgment, it is accordingly* the judgment of this Court . . . (Emphasis added.)

\* \* \*

The order, entered without objection, suspended execution of sentence in each case pending action upon appeal and appointed Stamper's trial counsel as his attorneys to represent him in his appeal.

In the absence of objection, we deem the order of the trial court to contain an accurate statement of what transpired. If it contained an incorrect statement of fact, counsel for Stamper had 21 days after its entry on February 9 to have it corrected. Rule 1:1. They did not do so, although the transcript was filed on February 15, and we presume that the order, as the final pronouncement on the subject, rather than

---

[5] Code § 19.2-298 provides in pertinent part:

"Before pronouncing the sentence, the court shall inquire of the accused if he desires to make a statement and if he desires to advance any reason why judgment should not be pronounced against him."

a transcript that may be flawed by omissions, accurately reflects what transpired. *See Southwest Bank* v. *Peoples Bank,* 216 Va. 788, 790. 224 S.E.2d 130, 132 (1976); *Woodard* v. *Commonwealth,* 214 Va. 495, 499, 201 S.E.2d 785, 788 (1974); *Heflin* v. *Commonwealth,* 211 Va. 407, 408, 177 S.E.2d 644, 645 (1970).

## IV. Appellate Review of the Death Sentence.

Our unique responsibility in reviewing death sentences is defined in Code § 17-110.1.[6] In two assignments of error, neither briefed nor argued, Stamper asserted that the death sentence in each case was imposed under the influence of passion, prejudice, undue influence, and other arbitrary factors, and that the death sentence is excessive and disproportionate to the penalty imposed in similar cases.

### A. Product of Passion or Other Arbitrary Factors.

■ In other parts of this opinion we have considered various assignments of error relating to evidence alleged to have tended to inflame the jurors and bring them under the influence of passion and prejudice. In each instance we found no error in the trial court's ruling that the evidence in question, while undoubtedly prejudicial, was admissible. The jury and the trial judge, after careful deliberations, independently concluded that the penalties of death were appropriate. Indeed, the jury made a careful distinction between the grounds upon which the death sentences were based. In the murders of Cooley and Mrs. Hicks, the sentence was based upon Stamper's proclivity for violence; in the more aggravated murder of Staples, the sentence was based upon Stamper's proclivity for violence and also upon his out-

---

[6] Code § 17-110.1 provides in pertinent part:

"C. In addition to consideration of any errors in the trial enumerated by appeal, the court shall consider and determine:

"1. Whether the sentence of death was imposed under the influence of passion, prejudice or any other arbitrary factor; and

"2. Whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant.

"D. In addition to the review and correction of errors in the trial of the case, with respect to review of the sentence of death, the court may:

"1. Affirm the sentence of death; or

"2. Commute the sentence of death to imprisonment for life.

"E. The Supreme Court may accumulate the records of all capital felony cases tried within such period of time as the court may determine. The court shall consider such records as are available as a guide in determining whether the sentence imposed in the case under review is excessive. Such records as are accumulated shall be made available to the circuit courts."

rageously or wantonly vile, horrible or inhuman conduct in committing the offense. We find nothing in the record to suggest that these conclusions were not the product of reasoned judgment and were the result of passion, prejudice, improper influence or any other arbitrary factor.

B. Excessiveness.

■ We have not previously reviewed a case where a defendant has been convicted under the revised death penalty statutes of multiple murders during the commission of an armed robbery. Thus, we have no similar cases to consider in determining whether the death sentences imposed upon Stamper are excessive or disproportionate. Nevertheless, we will refer briefly to other capital murder cases where we have considered the question of excessive punishment.

In *Smith* v. *Commonwealth, supra,* and *Waye* v. *Commonwealth, supra,* we affirmed the death sentence in each case for murder committed during the commission of rape, where the victims had been stabbed repeatedly and in other respects subjected to aggravated battery. In *Mason* v. *Commonwealth,* 219 Va. 1091, 254 S.E.2d 116 (1979), we upheld the death sentence for murder of a woman, who was raped, struck with an ax, and set on fire.

In *Coppola* v. *Commonwealth,* (this day decided), we upheld the death sentence for murder committed during the commission of armed robbery, where the murderer had repeatedly beaten the victim's head against the floor, knocking out five teeth, and had strangled her with a sock, although an accomplice, Miltier, who had participated in the crime and had struck the victim with his fist, had been convicted of capital murder and sentenced to life imprisonment. We also upheld the death sentence imposed in *Clark* v. *Commonwealth,* (this day decided), for murder for hire, although the death sentence of a codefendant had been commuted by the trial court to life imprisonment.

In the present case, there was evidence that Stamper tortured Staples or committed acts of aggravated battery against him before shooting him. Under these circumstances, even if Staples had been the only murder victim, the death sentence for this crime would not be excessive under the guidelines laid down in *Smith* and *Waye*. However, Staples was but one of three victims whom the jury found Stamper had deliberately killed with premeditation while he was committing armed robbery. As to the murders of Mrs. Hicks and Cooley, there was no direct evidence of torture or aggravated battery in the commission of those crimes, although mental torture might reasonably be

inferred from what could be characterized as execution-type murders. But each murder, coupled with Stamper's previous record of violent conduct, showed him to be a vicious menace to the public who in all probability would commit further acts of violence and be a continuing serious threat to society as long as he lives.

We have reviewed the record in the case of *Kearnard Tyrone Bowling* v. *Commonwealth,* Record No. 790401. Bowling, also charged with capital murder of Staples, Cooley, and Mrs. Hicks, was tried by a jury which found him guilty of first degree murder of Mrs. Hicks and guilty, as an accessory after the fact, of the murders of Staples and Cooley.[7] His punishment for the murder of Mrs. Hicks was fixed at confinement in the penitentiary for 25 years.

We analyzed the meaning of disproportionate sentencing in *Coppola.* Under the principles approved by the Supreme Court in *Gregg* v. *Georgia,* 428 U.S. 153 (1976), we held in *Coppola* that imposition of a sentence of life imprisonment upon a codefendant did not require commutation of the death sentence imposed upon the defendant who was convicted of the same capital murder. In that case, we held that there was a basis for distinguishing the atrociousness of the conduct of the defendant from that of his confederate, and we concluded that, as juries in this jurisdiction generally impose the death penalty for comparable or similar crimes, the death sentence conformed to the statewide standard.

We apply the same principles in the present case. Stamper's conduct was far more horrifying than Bowling's. There were conflicts in the evidence in the Bowling trial which the jury apparently had difficulty in resolving to determine Bowling's role in the crimes. Such conflicts were not present in the Stamper trial. Moreover, there was nothing in the record to indicate that Bowling had a tendency towards violent conduct, as Stamper did, that would make him a serious threat to society.

We cannot fairly determine whether a death sentence is excessive or disproportionate by comparing it with sentences imposed upon convictions for lesser included offenses, reached perhaps by compromise verdicts, even where there may be similarities in the evidence. The test

---

[7] There was evidence that Bowling had admitted to one or more persons that he had been present with Stamper at Shoney's, had killed Mrs. Hicks, and had received from Stamper $1,000 of the proceeds of the robbery. Bowling stated to the police, and testified at his trial, that he did not kill any of the three victims but did receive $1,000 from Stamper after the crimes had been committed. He also informed the police and reaffirmed in his testimony at trial that he told one or more persons that he had been present with Stamper during the commission of the crimes.

is not whether a jury may have declined to recommend the death penalty in a particular case but whether generally juries in this jurisdiction impose the death sentence for conduct similar to that of the defendant. We have no hesitancy in holding that the commission of multiple murders during an armed robbery is as heinous and horrifying as the commission of single rape-murders for which the death penalty was affirmed in *Smith, supra, Waye, supra,* and *Mason, supra.* Therefore, juries in this jurisdiction generally approve the supreme penalty for comparable or similar crimes. Accordingly, we hold that, considering the crimes and Stamper's background and history, the death sentence imposed upon him in each case is not excessive or disproportionate to sentences imposed in similar cases.

We have found no reversible error in the ruling of the trial court, and we have independently determined that the sentence of death was properly imposed in each case. Therefore, we decline to commute these sentences, and we will affirm the judgment of the trial court.

*Affirmed.*